## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### No. 19-10105-HH; 19-10122-HH

---

### UNITED STATES OF AMERICA,

### Plaintiff-Appellee,

### v.

### PRINCE TOBURAS ROLLE,

### Defendant-Appellant.

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA

---

### INITIAL BRIEF OF APPELLANT ROLLE

---

**DONNA LEE ELM**
**FEDERAL DEFENDER**

**ROSEMARY CAKMIS**
**Chief, Appellate Division**

**JENNY L. DEVINE**
**Florida Bar No. 0647616**
**Research & Writing Attorney**
**Office of the Federal Defender**
**400 North Tampa St., Ste. 2700**
**Tampa, Florida 33602**
**Telephone: (813) 228-2715**
**Facsimile: (813) 228-2562**
**Counsel for Appellant Rolle**

**Appeal No. 19-10105-HH; 19-10122-HH**

*United States v. Prince Toburas Rolle*

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

The persons listed below have an interest in the outcome of this case:

Ambrose, Bruce S.

Andrejko, Nicole M.

Antoon, Hon. John, II

Baker, Hon. David A.

Bentley, A. Lee, III

Bodnar, Roberta J.

Boggs, Emmett Jackson, Jr.

Cakmis, Rosemary

Counts, Clarence William Jr.

Devine, Jenny L.

Dickerson, Nicole B.

Elm, Donna L.

Grandy, Todd B.

Irick, Hon. Daniel C.

Kahn, Conrad B.

Kelly, Hon. Gregory J.

**Appeal No. 19-10105-HH; 19-10122-HH**

***United States v. Prince Toburas Rolle***

<u>**CERTIFICATE OF INTERESTED PERSONS**</u> – ***continued***

Lopez, Maria Chapa

Muldrow, W. Stephen

Presnell, Hon. Gregory A.

Ravenel, J. Bishop

Rhodes, David P.

Rolle, Prince Toburas

Ryan, Michael Shay

Skuthan, James T.

Smith, Michelle P.

Smith, Hon. Thomas B.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Rolle respectfully submits that oral argument will assist this Court in resolving the two issues raised in this multi-trial appeal: (1) whether this case presents structural error as a complete denial of counsel under *Cronic* when trial counsel was untimely, unprofessional, distracted, absent, exercised questionable judgment, displayed dubious ethics, and invited error at a critical stage; and (2) whether the district court erred by imposing the 2-level guidelines increase under U.S.S.G. § 3C1.2 for reckless endangerment during flight.

# TABLE OF CONTENTS

**Contents**                                                         **Page**

CERTIFICATE OF INTERESTED PERSONS ............................................ *C*1 *of* 2

STATEMENT REGARDING ORAL ARGUMENT .................................................. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ........................................................................... iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ........................................................................ viii

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 1

    I.    Course of Relevant Proceedings and Disposition in the Court Below ........................................................................ 2

        A.    February 2011 – February 2018 .................................. 2

        B.    Trial 1 – continued .................................................. 5

        C.    Trial 1 – mistrial ..................................................... 6

        D.    Trial 2 – mistrial ..................................................... 6

        E.    Trial 3 – guilty verdict ............................................. 7

        F.    September 2018 – December 2018 .............................. 12

        G.    Sentencing Hearing ................................................. 15

    II.    Statement of the Facts ................................................... 17

        A.    The Evidence of Mr. Rolle's Alleged Criminal Conduct ......... 17

## TABLE OF CONTENTS – *continued*

**Contents**                                                                 **Page**

B.    The Presentence Report ..............................................22

C.    The Consolidated Sentencing Hearing ....................................24

III.    Standard of Review ..................................................28

SUMMARY OF THE ARGUMENTS ....................................................29

ARGUMENTS AND CITATIONS OF AUTHORITY .........................................31

I.    The totality of circumstances surrounding Mr. Rolle's trial counsel amount to structural error under *Cronic* and demand *per se* reversal ........................................................................31

II.    The district court erred by imposing the 2-level guidelines increase under U.S.S.G. § 3C1.2 for reckless endangerment during flight ...........................................................................45

CONCLUSION ..................................................................52

CERTIFICATE OF COMPLIANCE ...................................................53

CERTIFICATE OF SERVICE ......................................................53

ADDENDUM A, B, C, D

iii

# TABLE OF CITATIONS

**Cases**                                                                    **Page**

*Appel v. Horn*, 250 F.3d 203 (3d Cir. 2001) .......................................44

*Arizona v. Fulminant*e, 499 U.S. 279 (1991) .....................................32

*Childress v. Johnson*, 103 F.3d 1221 (5th Cir. 1997) .......................44

*Davis v. United States*, 132 S. Ct. 2419 (2011) ................................47

*Dickerson v. State of Ala.,* 667 F.2d 1364 (11th Cir. 1982) ................3

*Florida v. Nixon*, 543 U.S. 175 (2004) ..............................................33

*Gideon v. Wainwright*, 372 U.S. 335 (1963) .....................................31

*Harding v. Davis*, 878 F.2d 1341 (11th Cir. 1989) ...........................44

*Holloway v. Arkansas*, 435 U.S. 475 (1978) .....................................33

*Kaley v. United States*, 571 U.S. 320 (2014) .....................................31

*Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003) .............................44

\*  *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016) .............51

*Neder v. United States*, 527 U.S. 1 (1999) ...................................32, 33

*Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997) ...............................44

*Satterwhite v. Texas*, 486 U.S. 249 (1988) ........................................31

*Stano v. Dugger*, 921 F.2d 1125 (11th Cir. 1991) (en banc) .............31

*Strickland v. Washington*, 466 U.S. 668 (1984) ...............................32

*Tucker v. Day*, 969 F.2d 155 (5th Cir. 1992) ....................................44

iv

## TABLE OF CITATIONS – *continued*

**Cases**                                                                                    **Page(s)**

\*       *United States v. Cronic*, 466 U.S. 648 (1984) ...........................................*passim*

        *United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996)..........................47, 50

        *United States v. Lackey*, 617 F. App'x 310 (5th Cir. 2015) .............................50

        *United States v. Martin*, 264 F. App'x 857 (11th Cir. 2008) .....................47, 50

        *United States v. Mogel*, 956 F.2d 1555 (11th Cir. 1992) .................................16

        *United States v. Pardo-Gerena,* 621 F. App'x 607 (11th Cir. 2015) ..........47, 50

        *United States v. Rey*, 811 F.2d 1453 (11th Cir. 1987) .......................................3

        *United States v. Roy*, 855 F.3d 1133 (11th Cir. 2017) (en banc),
          *cert. denied*, 138 S. Ct. 1279 (2018) ................................................28, 33

\*       *United States v. Washington*, 434 F.3d 1265 (11th Cir. 2006).............28, 46, 50

\*       *United States v. Wilson*, 392 F.3d 1243 (11th Cir. 2004) .................................46

        *United States v. Woodcock*, 167 F. App'x 693 (9th Cir. 2006)........................51

        *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017)...........................................32

**United States Constitution**

        U.S. Const. amend. VI.................................................................*passim*

**Statutes**

        18 U.S.C. § 401 ....................................................................................12

        18 U.S.C. § 922 ......................................................................................4

        18 U.S.C. § 924 ......................................................................................4

v

## TABLE OF CITATIONS – *continued*

**Statutes**                                                    **Page(s)**

18 U.S.C. § 3231 ................................................................. viii

18 U.S.C. § 3553 ......................................................24, 27, 43

18 U.S.C. § 3582 ...................................................................2

18 U.S.C. § 3742 ................................................................. viii

21 U.S.C. § 2 ........................................................................2

21 U.S.C. § 841 ................................................................2, 4

21 U.S.C. § 846 ....................................................................2

28 U.S.C. § 1291 ................................................................ viii

**United States Sentencing Guidelines**

U.S.S.G. § 2A1.4 ...............................................................46

U.S.S.G. § 2K2.1 ...........................................................22, 23

U.S.S.G. § 3C1.1 ...............................................................23

U.S.S.G. § 3C1.2 .........................................................*passim*

U.S.S.G. § 3D1.2 ...............................................................22

U.S.S.G. § 3D1.3 ...............................................................22

U.S.S.G. § 4B1.1 ...............................................................51

U.S.S.G. § 5H1.9 .........................................................*passim*

## TABLE OF CITATIONS – *continued*

**Rules**                                                              **Page(s)**

Fed. R. App. P. 32 ....................................................................53

Fed. R. Crim. P. 29 ...................................................... 11, 38, 42

**Other Authorities**

https://starchase.com/technology.php ............................................17

## STATEMENT OF SUBJECT-MATTER AND
## APPELLATE JURISDICTION

This is a consolidated direct appeal from two judgments of the United States District Court for the Middle District of Florida, Orlando Division, entered on January 8, 2019. *See* Case No. 6:09-cr-103-Orl-31GJK ("2009 Case"), Doc. 141; Case No. 6:17-cr-301-Orl-31GJK ("2017 Case"), Doc. 125. The district court had original jurisdiction under 18 U.S.C. § 3231. Mr. Rolle timely filed a notice of appeal on January 8, 2019. *See* 2009 Case, Doc. 142; 2017 Case, Doc. 127. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.    Whether the totality of circumstances surrounding Mr. Rolle's trial counsel amount to structural error under *Cronic* and demand *per se* reversal?

II.   Whether the district court erred by imposing the 2-level guidelines increase under U.S.S.G. § 3C1.2 for reckless endangerment during flight?

## STATEMENT OF THE CASE

Mr. Rolle's trial counsel, Nicole Dickerson, was arrested just before appearing as his retained counsel, was sanctioned and jailed during his cases, and was referred to the Florida Bar for possible suspension after his sentencing hearing. During her representation of Mr. Rolle, Ms. Dickerson was untimely, unprofessional, distracted, or just absent. Her judgment was questionable, if not unethical. More than one judge in more than one jurisdiction ruled that she was failing at every core duty of a criminal defense lawyer. The totality of circumstances here rise to the level of structural error and fall within the *Cronic* exception—a complete denial of counsel, infecting every level of the criminal proceedings with immeasurable harm.[1]

At a minimum, Mr. Rolle is entitled to a new sentencing hearing in the trial case so he may be sentenced under the correct guidelines range in light of the district court's erroneous application of the reckless endangerment enhancement.

---

[1]    Mr. Rolle respectfully preserves any ineffective assistance of counsel claim until after his direct appeal has been exhausted.

I.    **Course of Relevant Proceedings and Disposition in the Court Below**

A. **February 2011 – February 2018**

On February 8, 2011, the Honorable District Court Judge Antoon sentenced Mr. Rolle for conspiracy and substantive possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, and 2. *See* 2009 Case, Doc. 65 at 2. Judge Antoon imposed 112 months' imprisonment, followed by a 5-year term of supervised release. *Id.* at 2-3. Mr. Rolle's prison term was later reduced under 18 U.S.C. § 3582(c)(2) to 96 months. Doc. 90.

While serving his 5-year term of federal supervision, Mr. Rolle was arrested by state authorities for new criminal conduct allegedly stemming from contact with the Orlando Police Department's "TAC" unit on September 27, 2017. Doc. 152 at 3-4. Mr. Rolle's initial appearance on the federal violation of supervised release was held on October 31, 2017; the preliminary examination and detention hearings were held on November 2 and 7, 2017. Docs. 152, 116, 118. The magistrate judge found probable cause for the violations and detained Mr. Rolle. Docs. 111, 112.

Just before being retained by Mr. Rolle in his federal violation of supervised release case, Ms. Nicole Blair Dickerson was also detained by Orlando Police Department's TAC unit after she resisted arrest at a traffic stop. *See* Orange County Case No. 48-2017-MM-9328-A-O ("Dickerson Criminal Case"), Criminal

Complaint.[2] On October 7, 2017, TAC unit Officers Stanley Avignon and Landon Thomas stopped Ms. Dickerson for speeding, driving a vehicle with an expired tag, and driving with a suspended license. *Id*. at 2. Ms. Dickerson repeatedly refused to roll down her window for Officer Thomas, and Officer Avignon ordered her to step out of the vehicle. *Id*. Ms. Dickerson told the officers she was a defense attorney and knew her rights; she refused many verbal commands to get out of the vehicle. *Id*. As the officers removed Ms. Dickerson from her vehicle, she made statements such as "you guys get me clients," "do you need me to help spell your reports," and "I make way more money than you." *Id*. Ms. Dickerson continued to actively try to pull away from the officers, and made additional comments, including "I would love to get some of OPD's money." *Id*. at 3. TAC unit Sergeant Whited was advised of the incident. *Id*.

On November 2, 2017, while Ms. Dickerson represented Mr. Rolle in his preliminary examination hearing, she was formally charged by the State of Florida in Orange County Case No. 48-2017-MM-9328-A-O for resisting arrest without violence. *See* Dickerson Criminal Case, Information. On December 20, 2017, a federal grand jury returned a two-count indictment against Mr. Rolle for his alleged criminal

---

[2]     Five documents cited from the Dickerson Criminal Case are attached to this brief as Addendum A. Mr. Rolle respectfully asks this Court to take judicial notice of the documents. *See United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts."); *see also Dickerson v. State of Ala.*, 667 F.2d 1364, 1368 (11th Cir. 1982) (relying "on this Court's inherent equitable powers to supplement the record").

conduct stemming from contact with the TAC unit, charging that he possessed with intent to distribute a mixture and substance containing fentanyl, and possessed a firearm and ammunition after having been previously convicted of a felony, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c) and 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* Case 2017, Doc. 1. Having retained Ms. Dickerson on his violation of supervised release case, Mr. Rolle also retained her to represent him on his new case, and entered a plea of not guilty. Doc. 151.

In February 2018, Ms. Dickerson failed to appear on behalf of Mr. Rolle for a status conference in the trial case before the Honorable District Court Judge Presnell. Doc. 156. On March 8 and 9, 2018, Ms. Dickerson was the defendant in her own trial. *See* Dickerson Criminal Case, Criminal Trial Minutes. Orlando Police Department TAC unit Officers Avignon and Thomas testified against Ms. Dickerson, and she was convicted of resisting arrest without violence. *Id.* The state judge imposed a 10-day suspended sentence with 2 days already served, 100 community service hours, and ordered Ms. Dickerson to write an apology letter to both officers. *See* Dickerson Criminal Case, Order of Disposition. Four days later, Ms. Dickerson appeared in federal district court on behalf of Mr. Rolle, asked for a trial date in April, but advised Judge Presnell that a guilty plea was likely. *See* 2017 Case, Doc. 145.

**B. Trial 1 – continued**

No guilty plea was set, and no pretrial motions were filed before the first trial. The government's witness list included TAC unit Sergeant Whited. Doc. 34. On the morning of trial, Mr. Rolle's counsel asked for a continuance, "apologized for the untimeliness of the motion," and cited late discovery disclosures by the government. Doc. 147 at 5. After a long discussion with the parties, the district court determined that "part of this problem is that this case --

> I was sort believing and I assume the Government was led to believe that Mr. Rolle was going to plead, and the decision to go to trial was made at the last minute, which I'm not happy about either. But this case is not ready for trial.

*Id*. at 19. The district court again stated that he was "not happy about it," and excused the jury pool, explaining that "this may be the first time in 17 years I've had to excuse a jury because of a continuance being granted on the day of trial." *Id*. at 19, 21. Before choosing a new trial date, the district court told the defense:

> The plea deadline in this case has expired, so Mr. Rolle has a constitutional right to plead, but I will not accept a plea agreement at this point. I'm done with that. So we're going to try this case or you plead straight up, and hopefully no more excuses.

*Id*. at 22.

5

### C. Trial 1 – mistrial

Again, no guilty plea was set, and no pretrial motions were filed. The first trial was held in May 2017. *See* Docs. 53, 55, 57. On the second day of trial, Ms. Dickerson failed to appear:

> Let the record reflect we tried to call Ms. Dickerson, and her voice mailbox is full, and we were unable to leave a message. So here we all sit and wait.

Doc. 55 at 5. Ms. Dickerson arrived about 12 minutes later, and the district court stated that "[a] total of about 21 people have spent the last 15 minutes here waiting for your arrival," and "[u]nless you have a very good excuse, I'm going to find you in contempt and impose a sanction, but we'll talk about that later." *Id*. at 6. Ms. Dickerson apologized, and the court imposed no sanction. The district court declared a mistrial after the jury failed to reach a verdict. Doc. 50.

### D. Trial 2 – mistrial

The second trial was held in June 2017. *See* Docs. 81, 83, 85, 87. Prior to the second trial, no pretrial motions were filed. The government's witness list again included TAC unit Sergeant Whited. Doc. 59. The defense's witness list comprised 26 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas. Doc. 60.

On the morning of the first day of trial, the government raised questions about the defense's witness list: "There appears to be . . . more than 20 officers on the defense

witness list that have no relevant information to this case, and . . . [it is] just sort of taking a -- a huge amount of the Orlando Police Department out of duty for a period of a trial." Doc. 81 at 6. Ms. Dickerson responded that "it will only add about 30 minutes to the case," "[t]he officers . . . did have some involvement," and "they're not just sitting here for three days." *Id*. at 7. The government told the district court that "[s]he's basically subpoenaed every single officer who checked in on the dispatch at some point, many of whom were not even at the scene of this case," which the court agreed "would be an abuse of process." *Id*. at 8. Later that morning, Ms. Dickerson told the district court she had excused 7 of the 26 witnesses. *Id*. at 99. She did not excuse Officers Avignon or Thomas.

On the second day of trial, the government called Sergeant Whited to testify. Doc. 83 at 104-116. And the defense called Officer Avignon to testify. *Id*. at 231-234. The record does not reflect that Ms. Dickerson's connection with the Orlando Police Department's TAC unit, or these specific individuals, was ever brought to the court's attention. At the end of the second trial, the district court declared a mistrial after the jury failed to reach a verdict. Doc. 70.

### E. Trial 3 – guilty verdict

Mr. Rolle moved for bond in the trial case pending the third trial, but during the hearing defense counsel withdrew the request so bond could first be sought in the violation case. Docs. 71, 153. Mr. Rolle moved for bond in the violation case, which

was denied after a hearing. Case 2009; Docs. 120, 154. On August 14, 2018, Ms. Dickerson failed to appear for Mr. Rolle's status hearing. 2017 Case, Doc. 158. The district court reached her by telephone:

> You're making a habit of not appearing or appearing late. Is it time for me to start fining you for this?

Doc. 158 at 5. Ms. Dickerson apologized and the third trial was scheduled. *Id*.

The third trial was held in September 2017. *See* Docs. 160, 162, 164. No pretrial motions were filed before the third trial. The government's witness list again included TAC unit Sergeant Whited. Doc. 97, 98. The defense's witness list comprised 28 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas. Doc. 95. On the morning of the first day of trial, the government raised an issue with the defense witness list again, stating "I just think there is an abuse of process making these officers basically be prisoner here at the courthouse for several days when they have nothing relevant to offer." Doc. 160 at 4. The district court responded:

> Ms. Dickerson, we went through those last time, and I don't understand subpoenaing all these police officers you're not going to call. Unless you've got a good explanation, I'm going to have to start imposing sanctions. You were late again this morning. You've been late before. I overlooked it the last time, but I'm not going to start overlooking this stuff anymore.

*Id*. at 5. Ms. Dickerson stated:

> [I]t's the defense's position that all of these officers have information that's relevant to the case. They all responded to the scene. They all took part in locking down the apartment complex where they believed that Prince Rolle was hiding. So these are all officers that the defense believes

8

has relevant information, even if that relevant information is 'We never saw Mr. Rolle.'

*Id*. at 5-6. The district court cautioned Ms. Dickerson that "unless there's a good reason for having all these police officers under your subpoena, I'm going to do something about it later." *Id*. at 7.

The parties also discussed the government's investigation into one of the defense witnesses, Mr. Rolle's then-girlfriend Alexandra Charles, for perjury during the first two trials.[3] *Id*. at 5-9. Ms. Dickerson also noted the "thousands and thousands of pages of phone records" disclosed before the third trial related to Ms. Charles's AT&T account, but hired no defense expert and made no motion in limine on those records or the associated cellular tower evidence allegedly placing Mr. Rolle in the area of the crime. *Id*. at 7-8.

On the second morning of trial, the district court fined Ms. Dickerson $100 for being late again. Doc. 162 at 4; Doc. 110. The district court also noted:

> With respect to the issue of your staff, yesterday afternoon one of the marshals observed your staff person using your cell phone in the back of the courtroom, and the chief security -- courtroom security officer was called and attempted to inquire into the matter. It appears as though your assistant was using your cell phone to make personal texts in the courtroom, which is not authorized by my order.

---

[3]      Ms. Charles testified during the first two trials that she met up with Mr. Rolle in the early evening of October 27, 2017, that he told her his rental vehicle had been stolen, and that she persuaded him to report the rental car stolen. Doc. 55 at 171-179; Doc. 83 at 250-261. After the second trial, the government began to investigate what it believed to be a false alibi supported by Ms. Charles's testimony.

9

When Officer Perez asked to see the phone, your assistant refused to provide it. When Officer Perez asked for her identification, she refused to provide it. She said she was going back into the courtroom. Officer Perez says, 'No, you're not.' She attempted to forcefully enter the courtroom. She was forcibly stopped by Officer Perez. She then insulted Officer Perez by calling him a 'fucking asshole,' at which point she was escorted from the courthouse and was told she is no longer allowed to enter until I rule otherwise.

I'm not inclined to rule otherwise, Ms. Dickerson, unless you have some good cause.

Doc. 162 at 4-5. Ms. Dickerson did not apologize to the district court, but stated that she had "addressed this issue" with the employee, and "she won't be coming back for the remainder of this trial." *Id.* at 5.

During the second day of trial, the government called TAC unit Sergeant Whited to testify again. *Id.* at 113-128. The government also introduced evidence and testimony related to the AT&T records and associated cellular service location information, which Ms. Dickerson objected to only on relevance grounds. *Id.* at 192-242; *see also* Doc. 103 (government's exhibit list and attached exhibits). The parties discussed Ms. Charles again, and the government told the district court that "[a]n affidavit has been drafted," and "it's a very real possibility that she will . . . be arrested on a complaint for perjury" for her testimony during trials one and two. *Id.* at 259-261.

The next day, the district court advised Ms. Charles of two matters: (1) "when you are put under oath to testify, you swear or affirm to tell the truth; and you understand that, if you do not tell the truth, you could be prosecuted for the crime of

perjury"; and (2) "if you choose to testify or if you're compelled to testify in this case, that if you're asked any questions, the answers of which you think might incriminate you, that you have the right under the Fifth Amendment to our Constitution to decline to answer any such questions." Doc. 164 at 62-63. Ms. Charles indicated that she understood, and that she had just learned of the perjury investigation last evening. *Id*. at 63-64. The government told the district court that Ms. Dickerson had known about the perjury investigation for about a week. *Id*. at 65. The district court decided that Ms. Charles still had time to consult with an independent lawyer. *Id*. at 65-66. Ultimately, Ms. Charles was not called to testify during the third trial.

After the government closed its case-in-chief, Ms. Dickerson did not move for a judgment of acquittal under Fed. R. Crim. P. 29. She did, however, call Officer Avignon to testify again. *Id*. at 85-87. And again, the record does not reflect that Ms. Dickerson's connection with the TAC unit was ever brought to the court's attention. Ms. Dickerson called no defense witnesses or experts to attack cellular tower evidence placing Mr. Rolle near the crime. *See* Doc. 104 (defendant's exhibit list and attached exhibits). And at the close of the case, defense counsel made no Rule 29 motion to the district court, and made no objections to the jury instructions. *See* Doc. 102 (district court's instructions to the jury). The jury returned a guilty verdict on both counts. Doc. 106.

11

### F.  September 2018 – December 2018

Four days after the verdict, United States District Court Judge Dalton *sua sponte* issued an Order to Show Cause about "an incident . . . involving defense attorney Nicole Blair Dickerson and the unauthorized use of Ms. Dickerson's cellphone by an individual sitting in the gallery during [Mr. Rolle's] jury trial." *See* Case No. 6:13-mc-94-Orl-RBD, Docs. 3, 3-1 (incident report).[4] The Order stated that a "[f]ailure to abide by the Standing Order is a sanctionable offense," and "[t]he Incident Report provides grounds for the imposition of sanctions." *Id.* at 2; *see also* Doc. 3-2 (standing order). Ms. Dickerson was noticed to appear on September 18, 2018, along with her employee, "to show cause why sanctions should not be imposed." *Id.* She failed to appear. Doc. 9. Judge Dalton started criminal contempt proceedings "pursuant to 18 U.S.C. § 401 for: (1) violating the Standing Order; (2) failure to comply with the Court's Order To Show Cause of September 10, 2018 ordering her appearance before the undersigned; and (3) failing to comply with the Order to pay a monetary fine imposed by U.S. District Judge Gregory A. Presnell on

---

[4]    Documents cited from this civil contempt case are attached to this brief as Addendum B. Mr. Rolle respectfully asks this Court to take judicial notice of the documents. *See supra* note 2.

September 6, 2018." Doc. 6; *see also* Case No. 6:18-cr-215-RBD-DCI ("Contempt Case"), Doc. 1.[5]

On September 21, 2018, Ms. Dickerson was remanded into state custody for 8 days for failing to complete her 100 community service hours. Dickerson Criminal Case, September 21, 2018 Order. Within a week of her release from custody, she appeared with Mr. Rolle at his final revocation hearing for his violation of supervised release case. 2009 Case, Doc. 156. The magistrate judge took judicial notice of the jury's guilty verdict on two counts of new federal criminal conduct, and stated that he would recommend Mr. Rolle be adjudicated guilty of violating his supervised release. *Id*. at 4-5. The matter was later consolidated for sentencing alongside the 2017 case.

On November 16, 2018, Ms. Dickerson appeared as the defendant before Judge Dalton for a conference to address the status of potential federal criminal contempt charges. Contempt Case, Doc. 14. At the hearing, the government stated its decision to decline prosecution of the contempt matter, because they could not prove the requisite mental state for the offense. *Id*. at 3-6. The district court asked, "Is it the Government's position that Ms. Dickerson's office is so disorganized, that her failure to instruct her employees was so obvious that you were unable to

---

[5]    Documents cited from this criminal contempt case are attached to this brief as Addendum C. Mr. Rolle respectfully asks this Court to take judicial notice of the documents. *See supra* note 2.

13

demonstrate that she had willfully -- that she had received notice of the order and willfully ignored it?" *Id*. at 6-7. The government responded "yes, Your Honor." *Id*. at 7.

After hearing from Ms. Dickerson, the district court found "that it does not sound to me like you're qualified to practice in the United States District Court based on your current level of office organization or professionalism." *Id*. at 7-14. The court also shared that it was "not persuaded that you meet the standard that would be required to practice here," and decided to "refer it to the grievance committee." *Id*. at 15. The district court continued:

> I'm concerned that even now the Court doesn't have your attention.
>
> I find it, frankly, stupefying that a practicing lawyer who wants to appear in the United States District Court would be so cavalier, first of all, about receiving a fine from the presiding judge at all; secondly, not bothering to, as you say, click on the attachment; not bothering to open your mail; not bothering to pay the fine; attempting to pay the fine and being told it must be paid with cash and then saying either -- to yourself, I guess, that you would just get around to it when you next had an opportunity. It's stupefying and unacceptable.

*Id*. And the court opined that Ms. Dickerson did not "seem to be particularly remorseful about [her] conduct. *Id*. at 16.

The district court asked after her pending cases in federal court, which included only Mr. Rolle and one other, and told Ms. Dickerson the matter would be referred to the Middle District of Florida's grievance committee. *Id*. at 19. The court reiterated, "the level of professionalism and competence that you've displayed up to

14

this point in time is not an acceptable level for a practitioner here in this court." *Id.* at 20.

About 10 days later, Florida's 5th DCA sanctioned Ms. Dickerson. *See* Florida 5th DCA Case No. 5D18-0904, December 10, 2018 Order (executed by Judges Torpy, Lambert, and Eisnaugle).[6] The 5th DCA found that Ms. Dickerson had willfully disregarded court orders, failed to represent her clients competently, and lacked candor to the court. *Id.* Its order outlined a grim pattern of ignoring notices and deadlines, abandoning appellate clients, being untruthful to clients about her neglect, lacking candor to the court about Judge Presnell's sanctions during Mr. Rolle's case, and exhibiting a cavalier demeanor about it all. *Id.* The 5th DCA's order was forwarded to the Middle District of Florida and the Florida Bar. *Id.*

**G. Sentencing Hearing**

Less than a month later, on January 7, 2019, Ms. Dickerson represented Mr. Rolle at his consolidated sentencing hearing for both the 2009 and 2017 cases. 2009 Case, Doc. 159; 2017 Case, Doc. 166. The district court overruled defense objections to the facts, and the guidelines enhancements for obstruction of justice and reckless endangerment. Doc. 166 at 6-7. Ms. Dickerson argued for a guidelines departure

---

[6]     The document cited is attached to this brief as Addendum D. Mr. Rolle respectfully asks this Court to take judicial notice of the document. *See supra* note 2.

under U.S.S.G. § 5H1.9 (an upward departure provision[7]), and made no downward variance argument in mitigation of Mr. Rolle's sentence. *Id.* at 9-12. In the 2017 case, Ms. Dickerson asked for the low-end of the guidelines (210 months), and she left the 2009 case to "the discretion of the court" without argument. *Id.* at 13, 25. After "struggling to find any mitigation," the district court imposed 210 months' imprisonment followed by a 3-year term of supervised release, and a consecutive 24 months' imprisonment on the violation of supervised release case. *Id.* at 19-21, 26. Ms. Dickerson made no objections to the sentence or how it was imposed. *Id.* at 22, 27.

Just over a month after Mr. Rolle's sentencing hearing, the grievance committee returned its findings to Judge Dalton, specifically cited Mr. Rolle's case, and recommended "serious sanctions" against Ms. Dickerson. Contempt Case, Doc. 16. Judge Dalton directed Ms. Dickerson to respond. Doc. 17 (endorsed order). She failed to do so. On March 8, 2018, Judge Dalton adopted the report and recommendations of the grievance committee in its entirety, which included a referral to the Florida Bar, suspension from practice in the Middle District of Florida until 2020, and the requirement she complete nine conditions before petitioning for reinstatement. Doc. 18.

---

[7]    *United States v. Mogel*, 956 F.2d 1555, 1564 (11th Cir. 1992) ("The Commission determined dependence upon criminal activity for a livelihood to be an aggravating factor.").

This is Mr. Rolle's timely consolidated appeal of the criminal judgments and sentences. 2009 Case at Doc. 142; 2017 Case at Doc. 127. Mr. Rolle is incarcerated.

## II.    Statement of the Facts

### A. The Evidence of Mr. Rolle's Alleged Criminal Conduct

On October 27, 2017, Officers Joel Williams and Travis Ring with Orlando Police Department's Tactical Anti-Crime ("TAC") unit were driving an unmarked vehicle when they noticed a blue Hyundai Sonata roll through the stop sign opposite them at an intersection. Doc. 160 at 150; Doc. 164 at 21. The officers claimed they could see the driver's face and that the driver was not wearing a seatbelt as he made a left-hand turn, despite the Hyundai's dark-tinted side windows. Doc. 160 at 150-151; Doc. 164 at 22. The officers turned behind the Hyundai, ran the vehicle tag, and discovered that it was a rental vehicle. Doc. 160 at 152; Doc. 164 at 23. Officers Williams and Ring did not stop the Hyundai, but called in another TAC unit team equipped with "StarChase."[8] Doc. 160 at 153; Doc. 164 at 24.

TAC unit officers routinely use StarChase, because it "avoids us getting into a high-speed pursuit, which could ultimately lead to safety issues or danger for the

---

[8]    StarChase is a GPS system installed on the front of a law enforcement officer's vehicle, and deployed through a dart-like projectile that adheres to the back of the target vehicle. The GPS "dart" tags and tracks the target vehicle so law enforcement can remotely track and pursue it without engaging in dangerous high-speed chases. *See* https://starchase.com/technology.php (last viewed on June 20, 2019).

general public with people fleeing the police and running red lights as well as us having to go high speed in a very unsafe driving pattern." Doc. 53 at 38. Ultimately, "if we try to pull someone over and they don't stop, they take off, they accelerate at a high rate of speed, we don't want to engage in pursuit of them because it's a danger to the public." Doc. 160 at 153. According to officers:

> The purpose of this technology is so that we don't engage in a high-speed pursuit, which is a great danger to the public, to ourselves, and, in addition, to the individual in the fleeing car. If we can back off and not chase them, then they will drive under normal traffic and won't be running red lights and excessively speeding, causing a danger to the public.

Doc. 81 at 125. Instead, officers "apprehend them as soon as we can after they've slowed down," which, according to the government, "avoid[s] the safety issues inherent in high-speed chases." Doc. 160 at 154; Doc. 55 at 197.

TAC unit Officers Zachary Evans and Jeffrey Staudenmaier responded in a vehicle equipped with StarChase, maneuvered behind the blue Hyundai, and activated police lights and sirens. Doc. 160 at 154; Doc. 164 at 25. The Hyundai did not stop, accelerated away from the police "at a high rate of speed," and Officers Evans and Staudenmaier deployed StarChase. Doc. 160 at 154; Doc. 162 at 84. The TAC unit "let [the Hyundai] go" and watched for the car to "start driving normal speeds." Doc. 160 at 160. When officers "obtained [an] eye" on the Hyundai a few minutes later, it "was not" travelling at a high rate of speed. Doc. 164 at 27. In fact, the Hyundai was "slowing

down, stopping at red lights," and "was stuck in traffic, and . . . observing all traffic laws." Doc. 81 at 128; Doc. 53 at 129.

Once Officers Williams and Ring began to keep a safe distance behind the Hyundai, they observed a backpack being thrown out of the passenger-side window into a field. Doc. 160 at 161; Doc. 164 at 28. Because there were "no neighborhoods over there," the officers pinned the location for another team to recover later. Doc. 160 at 163. Officers Williams and Ring followed the Hyundai into an apartment complex. *Id*. at 164. As the officers entered the parking lot, they observed the Hyundai being parked, and the officers pulled in their vehicle to block the Hyundai. Doc. 160 at 164-165; Doc. 164 at 30. The Hyundai's driver got out of the vehicle, looked at the officers, and ran. Doc. 160 at 165; Doc. 164 at 30. Officer Williams chased the driver on foot and watched him discard a cellular phone. Doc. 160 at 166. Officer Williams also found a small black scale in pieces in one of the apartment's breezeways. *Id*. at 168.

Many TAC unit officers either responded by radio to this situation, or came to the scene to help, but no other officers saw the driver, and no suspect was apprehended. *See, e.g.*, Doc. 164 at 85-88 (testimony of defense witness Officer Avignon). A signed contract in the Hyundai identified Prince Rolle as the renter of the vehicle. Doc. 160 at 174; Doc. 164 at 32. Officers pulled up a picture of Mr. Rolle in DAVID, and testified that Mr. Rolle was the driver who had fled. Doc. 160 at 175; Doc. 164 at 32-33.

Meanwhile, Sergeant Whited recovered the discarded backpack, which contained a loaded firearm, and two bags that appeared to contain narcotics. Doc. 162 at 115-119. During Officer Williams's follow-up investigation, he received a tip that led him to recover a YouTube.com video, predating the events of September 27, which allegedly depicted Mr. Rolle wearing the discarded backpack. Doc. 162 at 24; *see also* Docs. 103-31, 103-32, 103-33, 103-34. A warrant was obtained for Mr. Rolle's arrest.

On the evening of October 27, 2017, Mr. Rolle reported to the Orange County Sherriff's Office that his Hyundai rental car had been stolen earlier in the day. Doc. 162 at 139. Deputy Adam Villar wrote a stolen vehicle report the next day. *Id*. at 141. Sometime later, Deputy Villar spoke with the federal probation officer who supervised Mr. Rolle, Julio Dominguez, who was concerned that Mr. Rolle had fabricated the stolen vehicle report. *Id*. at 142. Deputy Villar reviewed the information from the Orlando Police Department, and determined that Mr. Rolle had filed a false police report.[9] *Id*. at 143.

Further investigation revealed several facts. First, lab tests confirmed that one of the mixtures and substances contained a detectable amount of fentanyl. Doc. 164 at 11. Second, Alcohol Tobacco and Firearms ("ATF") agents determined that the firearm and ammunition were manufactured outside Florida. Doc. 162 at 254-255. Third, the Orlando Police Department noted that the discarded cellular phone was

---

[9]      Mr. Rolle was never charged with filing a false police report.

"brand new," and "looked like it had just been picked up from the Verizon store," but found a latent print on the phone, which did not match Mr. Rolle. Doc. 160 at 183; Doc. 162 at 133, 152. Fourth, rental car records reflected that Mr. Rolle had provided the company a phone number of (407) 404-2385 and an email address of Alexis874msn.com when he rented the Hyundai. Doc. 162 at 162, 167-168. Finally, law enforcement revealed that Alexandra Charles was Mr. Rolle's then-girlfriend, and her employment records reflected that she used an email address of Alexis874msn.com, and a phone number of (321) 512-7449. *Id*. at 181. Ms. Charles's AT&T account included both the phone number of (407) 404-2385, and the phone number of (321) 512-7449. *Id*. at 185, 197-198.

During the third trial, the records custodian for AT&T testified that he was unfamiliar with the disclaimers on their historical precision locator information documents. *Id*. at 211-212. There were no exhibits shown to the witness or moved into evidence to explain those disclaimers to the jury. ATF Agent Cecelia Marshall testified that, according to AT&T's cellular tower records, both the phone number of (407) 404-2385, and the phone number of (321) 512-7449, were near the events on October 27, 2017, and not near where Mr. Rolle told Deputy Villar he was when the Hyundai was stolen. *Id*. at 228-238. The government moved two exhibits into evidence created by Agent Marshall depicting the cellular tower location information overlaid on Google maps. *Id*. at 224-228; *see also* Docs. 103-37, 103-38. The defense objected to relevancy

21

(and the district court overruled the objection), but the defense made no other motions and introduced no expert in response to this evidence. Doc. 162 at 227. And the government's final witness, Mr. Rolle's probation officer, testified that he had contact with the defendant at the (407) 404-2385 phone number. Doc. 164 at 105. The jury returned a guilty verdict on both counts. Doc. 106.

## B. The Presentence Report

To prepare for sentencing, on December 6, 2018, the United States Probation Office issued its final Presentence Report. *See* Doc. 166 (cited as "PSR" followed by the appropriate paragraph or page number). It correctly noted the 20-year statutory maximum sentence for the narcotics count (Count One), and the 10-year statutory maximum sentence for the firearm and ammunition count (Count Two). PSR at 1. Under grouping rules at U.S.S.G. §§ 3D1.2(c) and 3D1.3(d), Count Two and § 2K2.1 drove the guidelines, and the PSR calculated these levels:

- Base Offense Level[10]                         24
- Specific Offense Characteristics[11]        + 4

---

[10]      The PSR determined under § 2K2.1(a)(2) that Mr. Rolle had two qualifying felony convictions: aggravated battery with a deadly weapon (law enforcement officer) (two counts), and federal conspiracy and possession with intent to distribute five grams or more of cocaine base. PSR ¶¶20, 51, 53.

[11]      The PSR determined under § 2K2.1(b)(6)(B) that Mr. Rolle possessed the firearm in connection with the felony offense of possession with intent to distribute fentanyl (Count One). PSR ¶21.

22

- Reckless Endangerment[12]                + 2
- Obstruction of Justice[13]               + 2
- Adjusted Offense Level                   32

Using the same priors that established § 2K2.1's base offense level, the PSR also determined that Mr. Rolle was a Career Offender. PSR ¶¶27-28. Because the offense level for the Career Offender guideline was 32, the same as the § 2K2.1 guideline, the total offense level remained 32. PSR ¶30. Similarly, Mr. Rolle's criminal history category was a VI with and without the Career Offender enhancement. PSR ¶¶56-57. The advisory guidelines range was 210-262 months. PSR ¶¶89-90.

The defense made several objections to the PSR: (1) the offense conduct at PSR ¶¶8-10, 12, and 13; (2) the reckless endangerment enhancement at PSR ¶¶13 and 24; and (3) the obstruction of justice enhancement at PSR ¶¶15 and 25. PSR at 31-32. Defense counsel also "submit[ted] that a departure pursuant to U.S.S.G. § 5H1.9 applies in this case," because "the defendant started a legal business and submitted proof of lawfully gained income since his release from incarceration." PSR ¶106. But "the parties [did] not advise[] the probation office of any factors which they believe[d]

---

[12]    The PSR determined under § 3C1.2 that "[t]he defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." PSR ¶24.

[13]    The PSR determined under § 3C1.1 that "[t]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offence of conviction and any relevant conduct; or a closely related offense." PSR ¶25.

23

warrant[ed] a sentence outside the advisory range" under 18 U.S.C. § 3553(a)(1)-(7). PSR ¶107.

The PSR also noted that Mr. Rolle lost his mother to heart failure in 2014, and has no relationship with his father. PSR ¶70. Mr. Rolle had one deceased half-sibling who passed away in 2007, and two others who are incarcerated. *Id.* Mr. Rolle was partially raised by his grandmother, who died in 1995, and also by his step-father, who died 15 days before his mother in 2014. PSR ¶71. Mr. Rolle has no family of his own. PSR ¶72.

The PSR also recounts a history of psychological and emotional evaluations during Mr. Rolle's school years. PSR ¶75. He was diagnosed with ADHD and prescribed medication, but also felt that his anger was hard to control after his grandmother died when he was 10 years old. PSR ¶76. According to school records, he was also diagnosed with emotional problems, and scored a functioning IQ of 81— in the 10% percentile. PSR ¶82. He was placed in ESE classes, and his reading and math skills never progressed beyond the 4th or low-5th grade level. *Id.* Mr. Rolle completed 527 hours of GED classes during his prior federal prison term, but he has no GED. PSR ¶83.

## C. The Consolidated Sentencing Hearing

At sentencing, the defense repeated its objections to the PSR. Doc. 166 at 4. On the reckless endangerment enhancement, the government responded:

> There was testimony in the case that Mr. Rolle sped away from the officers at a high rate of speed. Fortunately, in this case, because of the StarChase deployment, officers did not have to follow the defendant at that high rate of speed in order to catch up with him. But, in any event, he sped away from them at a high rate of speed, and there was a police chase in this case at least till the time that Mr. Rolle thought he was no longer being followed.

*Id*. at 5. The district court overruled the objections, and on the reckless endangerment found, "I also think the preponderance of the evidence supports those facts and, accordingly, would support the enhancement for . . . creating a risk of bodily injury by reason of his fleeing." *Id*. at 7. The district court determined that "the appropriate guidelines score is a 32-VI" and the guidelines range was between 210 and 262 months' imprisonment (capped at 240 months), and acknowledged that "because they do reach the same result . . . I didn't reach [the Career Offender] issue, but it does appear that Chapter 4 would be applicable and would result in . . . the same scoring result." *Id*. at 7-8. The court noted that the probation officer's recommendation was 210 months' imprisonment. *Id*. at 9.

The district court recognized the defense to speak, and counsel "apologize[d] for the untimeliness of the letters that were provided" from Ms. Alexandra Charles and others to support Mr. Rolle. *Id*. at 8. Defense counsel argued for a § 5H1.9 departure "on the basis of Mr. Rolle's lack of reliance upon criminal activity to make a living," describing positive steps he took since being released from federal prison. *Id*. at 9-11. The district court expressed confusion about her argument:

| THE COURT: | And, specifically, your downward departure is based on -- on what in the guidelines? |
| MS. DICKERSON: | What? In the guidelines? |
| THE COURT: | Yeah. |
| MS. DICKERSON: | It's -- I will -- |
| THE COURT: | Do you have a specific guideline reference that I'm to look to? Because this is -- this is new to me in terms of a departure, or are you talking about a variance? |
| MS. DICKERSON: | Can you say that last part again? I didn't hear you. |
| THE COURT: | Are you asking for a departure or a variance from the guideline score? |
| MS. DICKERSON: | A departure. |
| THE COURT: | Okay. Well, I need a specific reference to what -- I'm not aware of anything in the guidelines that suggests an effort to turn your life around is the basis for a departure. |
| MS. DICKERSON: | It is Section 5H1.9, presentation of information regarding departures, and it was -- I believe the term was 'lack of reliance upon criminal activity.' |
| THE COURT: | 5H1.9? |
| MS. DICKERSON: | 5H1.9. |
| THE COURT: | 'The degree to which the defendant depends upon criminal activity for a livelihood is relevant in determining the appropriate sentence.' |

*Id*. at 11-12. The government responded:

> [T]he facts suggest that the defendant was depending upon criminal activity for his livelihood. There's no evidence to the contrary. Indeed, we have scales. We have drugs. We have a firearm, tools of the trade of drug dealing. We have distribution amounts of fentanyl and other substances illegal under state law. So it seems to me that the evidence is that Mr. Rolle was depending upon criminal activity for his livelihood.

*Id*. at 12.

The district court denied the departure, and told the defense it would "be happy to hear from you with respect to mitigation and an appropriate sentence." *Id*. at 13. Defense counsel responded, "There's nothing further for the defense. We would ask that the Court sentence Mr. Rolle at the bottom of the applicable guidelines." *Id*. Other than asking the court questions about his Career Offender status, and the guidelines calculations, which he did not understand, Mr. Rolle declined to allocute. *Id*. at 13-16.

After hearing from the government, the district court determined that "from the offense standpoint, we're dealing with a serious matter." *Id*. at 19. The court also stated, "I'm struggling to find any mitigation here that would -- which would cause me to consider a sentence below the guidelines; and, indeed, defense counsel doesn't ask for a variance, merely a low end of the guideline, and I will honor that request. *Id*. at 20. The court reviewed some of the § 3553(a) factors, stated it had "considered all of the statutory factors," and imposed 210 months' imprisonment consecutive to the violation case. *Id*. at 20-21.

On the violation of supervised release case, the district court determined the guidelines range to be 33-46 months' imprisonment. *Id*. at 24. When asked "what sentence [the court] should impose for the violation . . . in the '09 case," defense counsel simply told the court, "Your Honor, we would leave the sentence within the discretion of the Court," and asked for a concurrent sentence. *Id*. at 25. The government responded that the district court had already imposed a consecutive sentence in the

2017 case, and asked for a low-end 33-month sentence. *Id*. at 25-26. Mr. Rolle again declined to allocute. *Id*. at 26. The district court imposed a 24-month term of prison to close the violation case. *Id*. at 27. The parties did not object to either sentence. *Id*. at 22, 27. This appeal follows.

## III.    Standards of Review

A criminal defendant is entitled to the "Assistance of Counsel for his defence." U.S. Const. amend. VI. In *United States v. Cronic*, the Supreme Court determined that "[i]f no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." 466 U.S. 648, 654 (1984). The *Cronic* exception provides that "prejudice is to be presumed, and therefore the harmless error rule does not apply, when a criminal defendant has been completely denied the right to counsel for a critical stage of the trial, which is an error that contaminates the entire proceeding." *United States v. Roy*, 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 1279, 200 L. Ed. 2d 475 (2018) (citing *Cronic*, 466 U.S. at 659 & n.25).

This Court reviews factual findings for clear error and the application of the United States Sentencing Guidelines to those facts de novo. *See United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENTS

I.      There is a difference between an ineffective assistance of counsel claim, and a claim governed by *Cronic*. This case is the latter. If a claim is governed by the former, a defendant must typically show that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not show any prejudice resulting from the lack of effective counsel. Mr. Rolle respectfully submits that his *Cronic* claim reveals a Sixth Amendment violation "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658.

The totality of circumstances here shatter the Sixth Amendment's framework for a fair trial and sentencing, and no inquiry into harmlessness could justify or cure the error. During Mr. Rolle's cases, his counsel was untimely, unprofessional, distracted, or just absent. Her judgment was questionable, if not unethical. This situation falls within the territory of *Cronic*'s presumptively prejudicial structural error—it amounts to a complete denial of counsel, infecting every level of the criminal proceedings to be intrinsically harmful to the criminal justice system. Mr. Rolle's cases are *per se* reversible, and he is entitled to a new trial, and a new revocation hearing, with new counsel.

II.     Mr. Rolle's mere flight from a traffic stop was neither "reckless" nor did it put another person in substantial risk of death or serious bodily injury. His

29

high-speed acceleration away from officers was considerably briefer and less dangerous than the conduct found by this Court to constitute reckless endangerment. That Mr. Rolle's conduct did not rise to the level of reckless endangerment makes sense here, because law enforcement orchestrated the traffic stop to ensure it did not endanger themselves or the public by using StarChase, a device specifically developed to avoid the high-speed chases penalized by U.S.S.G. § 3C1.2. Trial testimony clarifies there was no "chase," no "recklessness," and no "substantial risk of death or serious bodily injury." The district court erred when it imposed the enhancement, and Mr. Rolle is entitled to a resentencing.

## ARGUMENTS AND CITATIONS OF AUTHORITY

**I.      The totality of circumstances surrounding Mr. Rolle's trial counsel amount to structural error under *Cronic* and demand *per se* reversal.**

Time and time again, the Supreme Court has stressed the vital nature of the Sixth Amendment right to counsel as the right that preserves all others for a criminal defendant, and ensures the fundamental integrity of the judicial system. *See e.g.*, *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("Without counsel, the right to a trial itself would be 'of little avail,' as this Court has recognized repeatedly.") (listing cases); *Kaley v. United States*, 571 U.S. 320, 344 (2014) (Roberts, C.J., dissenting) (identifying the right to assistance of counsel as "the most precious right a defendant has, because it is his attorney who will fight for the other rights the defendant enjoys"); *see also Stano v. Dugger*, 921 F.2d 1125, 1170-71 (11th Cir. 1991) (en banc) (Tjoflat, J., dissenting) ("[T]he very integrity of our system—its fairness, its accuracy as a truth-seeking process, and thus its ability to accord justice—depends upon effective assistance of counsel."). Briefly, but best stated, "lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

Some Sixth Amendment right to counsel violations, "by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). In

31

*Cronic*, the Supreme Court identified three such situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658-59. The "complete denial of counsel" was the first and "[m]ost obvious" of those presumptively prejudicial structural errors. *Id.* at 659. The second is when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. Sometimes called the *Cronic* "exception," because its companion case set forth the general rule for requiring cause and prejudice in any ineffective assistance of counsel claim, the structural error doctrine demands *per se* reversal. *Id*. at 666 n.41 (noting that if Cronic chose to "pursue claims based on specified errors made by counsel on remand, they should be evaluated under the standards" pronounced in *Strickland v. Washington*, 466 U.S. 668, 691 (1984)).

Because "[t]he purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial," presumptively prejudicial structural errors are not "simply an error in the trial process itself." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907-08 (2017) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)) (internal quotations omitted). Instead, this "limited class of fundamental constitutional errors . . . defy analysis by harmless error standards." *Fulminante*, 499 U.S. at 309 (internal quotations omitted). "Errors of this type are so intrinsically harmful" that they

demand a finding of *per se* prejudice. *Neder v. United States*, 527 U.S. 1, 7 (1999). This is because "these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." *Neder*, 527 U.S. at 8-9 (internal citations and quotations omitted).

This Court has emphasized that the *Cronic* exception applies "to only a very narrow spectrum of cases." *Roy*, 855 F.3d at 1144. And this Court has noted that the defendant bears "a very heavy" burden of establishing that an error warrants the presumption of prejudice. *Id*. The *Cronic* exception is "reserved for situations in which counsel has entirely failed to function as the client's advocate." *Florida v. Nixon*, 543 U.S. 175, 189 (2004). It arises where "an inquiry into a claim of harmless error . . . would require, unlike most cases, unguided speculation." *Holloway v. Arkansas*, 435 U.S. 475, 491 (1978); *Cronic*, 466 U.S. at 658-59.

The totality of circumstances here shatter the Sixth Amendment's framework of a fair trial and sentencing, and no inquiry into harmlessness could justify or cure the error. The very nature of the circumstances preclude any meaningful inquiry. This situation falls within the territory of *Cronic*'s presumptively prejudicial structural error—it amounts to a complete denial of counsel, infecting every level of the criminal proceedings to be intrinsically harmful to the criminal justice system.

The timeline below establishes that during Mr. Rolle's cases, Ms. Dickerson was untimely, unprofessional, distracted, absent, exercised questionable judgment or outright unethical behavior, and invited error during a critical stage. Ms. Dickerson's personal issues began just 10 days after Mr. Rolle's alleged criminal conduct, and her professional problems culminated two months after Mr. Rolle's sentencing hearing. All impacted and contaminated Mr. Rolle's Sixth Amendment right to counsel:

| **Date** | **Event** | **Impact** |
|---|---|---|
| September 27, 2017 | Mr. Rolle's alleged offenses involving Orlando Police Department TAC unit | |
| October 7, 2017 | Nicole Dickerson's arrest by Orlando Police Department TAC unit Officers Stanley Avignon and Landon Thomas, who reported the incident to Sergeant Whited | Distracted |
| October 31, 2017 | Mr. Rolle first appeared in federal court for alleged violations of supervised release arising from the September 27, 2017 incident | |
| November 2, 2017 | Nicole Dickerson appeared on behalf of Mr. Rolle at his preliminary examination for alleged violations of supervised release arising from the September 27, 2017 incident | |
| November 2, 2017 | Nicole Dickerson is formally charged by the State of Florida for resisting arrest without violence against TAC unit Officers Avignon and Thomas | Distracted |
| November 7, 2017 | Continuation of Mr. Rolle's preliminary examination and detention hearing | |
| December 22, 2017 | Mr. Rolle's initial appearance for the 2017 case | |
| February 13, 2018 | Nicole Dickerson fails to appear at Mr. Rolle's status conference | Absent |

| **Date** | **Event** | **Impact** |
|---|---|---|
| March 8-9, 2018 | Nicole Dickerson's resisting arrest without violence trial where she was found guilty after Officers Avignon and Thomas testified for the state, and the judge imposed an 8-day suspended sentence on the condition she complete 100 hours of community service and write an apology letter to the officers | Distracted |
| March 13, 2018 | Nicole Dickerson advised Judge Presnell and the government that a guilty plea was likely; trial date was set | Judgment |
| Pretrial #1 | No guilty plea was set; no pretrial motions were filed | Judgment |
| April 21, 2018 | Government listed Sergeant Whited on witness list | |
| April 23, 2018 | Nicole Dickerson moved to continue Mr. Rolle's trial on the morning of jury selection • The district court agreed that the case was "not ready for trial," and noted that "I was sort believing and I assume the Government was led to believe that Mr. Rolle was going to plead, and the decision to go to trial was made at the last minute, which I'm not happy about either." Doc. 147 at 5-19. | Untimely |
| Pretrial #1 (continued) | No guilty plea was set; no pretrial motions were filed | Judgment |
| May 29, 2018 | Trial 1, Day 1 | |
| May 30, 2018 | Trial 1, Day 2 • Nicole Dickerson was 12 minutes late to trial—"[a] total of about 21 people have spent the last 15 minutes here waiting for your arrival," and "[u]nless you have a very good excuse, I'm going to find you in contempt and impose a sanction, but we'll talk about that later." Doc. 55 at 6. | Absent |
| May 31, 2018 | Trial 1, Day 3; mistrial declared after hung jury | |
| Pretrial #2 | No pretrial motions were filed | Judgment |

| **Date** | **Event** | **Impact** |
|---|---|---|
| June 18, 2018 | Government listed Sergeant Whited on witness list | |
| June 18, 2018 | Nicole Dickerson filed a witness list comprising 26 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas | Unprofessional/ Unethical |
| June 19, 2018 | Trial 2, Day 1<br>• The district court discussed with the parties whether Nicole Dickerson was committing "an abuse of process" to subpoena "every single officer who checked in on the dispatch at some point, many of whom were not even at the scene of this case" and make them "just sit[] here for three days." Doc. 81 at 6-8. She excused a few officers, but she did not excuse Officers Avignon or Thomas. | Unprofessional/ Unethical |
| June 20, 2018 | Trial 2, Day 2<br>• The government called Sergeant Whited to testify, and the defense called Officer Avignon to testify, but the record does not reflect that Ms. Dickerson's connection with the Orlando Police Department's TAC unit, or these specific individuals, was ever brought to the court's attention. Doc. 83 at 104-116, 231-234. | Unethical |
| June 21, 2018 | Trial 2, Day 3 | |
| June 22, 2018 | Trial 2, Day 4; mistrial declared after hung jury | |
| June 28, 2018 | Nicole Dickerson withdrew Mr. Rolle's motion for bond in the trial case at the bond hearing | Judgment |
| July 18, 2019 | Nicole Dickerson's motion for bond in the violation case was denied after a hearing | |
| August 14, 2018 | Nicole Dickerson failed to appear at Mr. Rolle's status conference, but was reached by phone 21-minutes late<br>• The district court determined that "[y]ou're making a habit of not appearing or appearing | Absent |

| **Date** | **Event** | **Impact** |
|---|---|---|
| | late," and asked whether "it [was] time for me to start fining you for this?" Doc. 158 at 5. | |
| Pretrial #3 | No pretrial motions were filed<br>• This included no motions in limine on the "thousands and thousands of pages of phone records" disclosed before the third trial related to Ms. Charles's AT&T account, or the associated cellular tower evidence allegedly placing Mr. Rolle near the crime. Doc. 160 at 7-8. | Judgment |
| August 30, 2018 | Government listed Sergeant Whited on witness list | |
| August 30, 2019 | Nicole Dickerson filed a witness list comprising 28 people, almost all law enforcement, including TAC unit Officers Avignon and Thomas | Unprofessional/ Unethical |
| September 4, 2018 | Trial 3, Day 1<br>• The district court cautioned Ms. Dickerson that "unless there's a good reason for having all these police officers under your subpoena, I'm going to do something about it later." Doc. 160 at 4-7.<br>• The parties also discussed the government's investigation into one of the defense witnesses, Mr. Rolle's then-girlfriend Alexandra Charles, for perjury during the first two trials. *Id*. at 5-9. | Unprofessional/ Unethical |
| September 5, 2018 | Trial 3, Day 2<br>• Nicole Dickerson was 12 minutes late to trial and fined $100. Doc. 162 at 4; Doc. 110.<br>• The district court also noted the situation that had occurred on Day 1 after Nicole Dickerson's paralegal had "us[ed] your cell phone to make personal texts in the courtroom," and had been "escorted from the courthouse and was told she is no longer allowed to enter until I rule otherwise." Doc. 162 at 4-5. | Absent/ Unprofessional |

37

| **Date** | **Event** | **Impact** |
|---|---|---|
| September 6, 2018 | Trial 3, Day 3; verdict<br>• The district court advised Ms. Charles of her rights on the perjury investigation and any future testimony, and Ms. Charles noted that she had just learned of the perjury investigation last evening even though Ms. Dickerson had known about the perjury investigation for about a week. Doc. 164 at 65.<br>• Ms. Dickerson did not move for a judgment of acquittal under Fed. R. Crim. P. 29.<br>• Ms. Dickerson again called Officer Avignon to testify, and again, the record does not reflect that Ms. Dickerson's connection with the TAC unit was ever brought to the court's attention.<br>• Ms. Dickerson called no defense witnesses or experts on cellular tower evidence placing Mr. Rolle near the crime.<br>• At the close of the case, defense counsel made no Rule 29 motion to the district court, and made no objections to the jury instructions. | Unprofessional/ Unethical/ Judgment |
| September 18, 2018 | Nicole Dickerson failed to appear at her own federal civil contempt hearing | Absent |
| September 21, 2018 | Nicole Dickerson began to serve an 8-day jail sentence for failure to complete the requirements of her suspended state sentence | Distracted |
| October 2, 2018 | Mr. Rolle's final revocation hearing took place and the magistrate judge took judicial notice of the guilty verdict and the matter was ultimately consolidated for sentencing alongside the 2017 case | |
| November 16, 2018 | Nicole Dickerson appeared at her federal criminal contempt status hearing, where the government declined to prosecute, but Judge Dalton referred the matter to the MDFL sanctions committee | Distracted |

38

| **Date** | **Event** | **Impact** |
|---|---|---|
| | • The district court clarified that it did not believe Ms. Dickerson was "qualified to practice in the United States District Court," did not "seem to be particularly remorseful about [her] conduct," and after asking after her pending cases (including Mr. Rolle's case), stated that "the level of professionalism and competence that you've displayed up to this point in time is not an acceptable level for a practitioner here in this court." Contempt Case, Doc. 14 at 7-14, 16, 20. | |
| December 10, 2018 | Florida's 5th DCA sanctioned Nicole Dickerson and outlined a grim pattern of her ignoring notices and deadlines, abandoning appellate clients, being untruthful to clients about her neglect, lacking candor to the court about Judge Presnell's sanctions during Mr. Rolle's case, and exhibiting a cavalier demeanor about it all | Distracted/ Unethical |
| January 7, 2019 | Mr. Rolle's sentencing hearing for both the trial and violation cases<br>• Ms. Dickerson argued for a guidelines departure under upward departure provision U.S.S.G. § 5H1.9, and made no downward variance argument in mitigation of Mr. Rolle's sentence. Doc. 166 at 9-12.<br>• On the 2017 case, Ms. Dickerson asked for the low-end of the guidelines (210 months), and she left the 2009 case to "the discretion of the court" without argument. *Id*. at 13, 25.<br>• After "struggling to find any mitigation," the district court imposed 210 months' imprisonment followed by a 3-year term of supervised release, and a consecutive 24 months' imprisonment on the violation of supervised release case. *Id*. at 19-21, 26. | Invited Error |

| **Date** | **Event** | **Impact** |
|---|---|---|
| | • Ms. Dickerson made no objections to the sentence or the manner in which it was imposed. *Id*. at 22, 27. | |
| February 19, 2019 | MDFL sanctions committee issued their Report & Recommendation, specifically cited Mr. Rolle's case, and recommended "serious sanctions" against Ms. Dickerson | Unethical |
| March 8, 2019 | Judge Dalton adopted the report and recommendations of the grievance committee in its entirety, which included a referral to the Florida Bar, suspension from practice in the Middle District of Florida until 2020, and the requirement she complete nine conditions before petitioning for reinstatement | Unethical |

The timeline reflects seven distinct categories of circumstances impacting structural error under *Cronic*. First, Ms. Dickerson was untimely when she alerted the district court and government that Mr. Rolle was likely to plea creating the need for a continuance on the morning of trial. The district court agreed that the case was "not ready for trial," and noted that "I was sort believing and I assume the Government was led to believe that Mr. Rolle was going to plead, and the decision to go to trial was made at the last minute, which I'm not happy about either." Doc. 147 at 5-19.

Second, Ms. Dickerson was unprofessional when she repeatedly subpoenaed many law enforcement officers not relevant to Mr. Rolle's defense, and never called as witnesses. The district court repeatedly stated concerns about this abuse of process. *See* Doc. 81 at 6-8; Doc. 160 at 4-7. Ms. Dickerson also allowed her

40

paralegal to violate local rules during trial, and failed to communicate with Ms. Charles, her witness, about pending perjury allegations for almost a week before trial. *See* Doc. 162 at 4-5; 164 at 65. Indeed, at Ms. Dickerson's criminal contempt hearing, the district court found that it did not believe Ms. Dickerson was "qualified to practice in the United States District Court," did not "seem to be particularly remorseful about [her] conduct," and after asking after her pending cases (including Mr. Rolle's case), stated that "the level of professionalism and competence that you've displayed up to this point in time is not an acceptable level for a practitioner here in this court." Contempt Case, Doc. 14 at 7-14, 16, 20.

Ms. Dickerson was also continually distracted during Mr. Rolle's cases. Before Mr. Rolle's first trial, she underwent her own criminal trial, conviction, and sentencing. After Mr. Rolle's third trial, she served an 8-day jail sentence. And leading to Mr. Rolle's sentencing hearing, Ms. Dickerson attended her own criminal contempt status conference, and faced sanctions from two separate jurisdictions.

Furthermore, Ms. Dickerson was repeatedly absent or late to Mr. Rolle's status conferences and trials. Even after being fined $100 by the district court for again being late to Mr. Rolle's third trial, which she did not pay on time, Ms. Dickerson failed to appear for her own civil contempt hearing.

Fifth, Ms. Dickerson's judgment was questionable throughout these proceedings. She informed the district court and the government that the case was a

41

likely guilty plea, but a guilty plea was never set. Before the trials, she filed no pretrial motions, even after "thousands and thousands of pages of phone records" were disclosed before the third trial related to Ms. Charles's AT&T account, and associated cellular tower evidence allegedly placed Mr. Rolle near the crime. Doc. 160 at 7-8. During the third trial, Ms. Dickerson failed to argue for a Rule 29 motion, and failed to call a defense expert to rebut the government's new cellular tower evidence. And after the guilty verdict, Ms. Dickerson had to withdraw and re-file Mr. Rolle's bond motion to argue it properly in the violation of supervised release case before the trial case.

At times, Ms. Dickerson even appears to have behaved unethically by allowing Ms. Charles allegedly to commit perjury for a false alibi during the first two trials, and by failing to alert the court to Ms. Dickerson's own personal conflict of interest with the TAC unit. To date, the record does not reflect that the district court was ever made aware of this conflict, despite the government repeatedly listing and calling Sergeant Whited to testify, and Ms. Dickerson repeatedly listing the officers who arrested her and calling Officer Avignon to testify. This is even more troubling when combined with the "abuse of process" concerns the court had over Ms. Dickerson's subpoenaing of so many TAC unit officers.

Finally, Ms. Dickerson invited error at a critical stage in the proceedings, Mr. Rolle's sentencing hearing, when she argued an upward departure guidelines

provision, litigated no matters under 18 U.S.C. § 3553(a) (despite the PSR's indication that ample mitigation evidence existed), asked for a low-end sentence and deferred an ultimate sentence to the district court, and failed to object to either sentence. Two months later, she had been suspended from practicing in the Middle District of Florida, and was referred to the Florida Bar. Indeed, during Mr. Rolle's case (and citing to Mr. Rolle's case), both the state and federal courts dealing with Ms. Dickerson's sanctionable behavior reflect a disturbing pattern of ignoring court orders, abandoning clients, being untruthful to clients, lacking candor to the court, and exhibiting a cavalier demeanor about it all.

The Sixth Amendment right to counsel violation here infected every level of the criminal proceedings. The pervasive disrespectful and unprofessional conduct by Ms. Dickerson occurred directly in this case, and indirectly around this case; it is impossible to parse any piece of it from the remainder. The chronology of events is not just disturbing for what Ms. Dickerson did wrong, but what she failed to do. Omissions are the hallmark of structural error. It is not performance, but the absence of performance, and the impossibility of any harmlessness review, that should cause this Court to find that the *Cronic* exception applies to this case.

Cases applying the *Cronic* exception are not common. *Cronic* itself was not reversed for *per se* structural error. But this Court, and others, have recognized the existence of structural error, and it has been applied in limited circumstances under

43

the first two prongs of *Cronic*. *See e.g.*, *Harding v. Davis*, 878 F.2d 1341, 1345 (11th Cir. 1989) (holding that "attorney's silence at the point the verdict was directed against his client was so likely to prejudice Harding that the cost of litigating its effect is unjustified and prejudice presumed"); *Appel v. Horn*, 250 F.3d 203, 214-15 (3d Cir. 2001) (finding constructive denial of counsel where attorneys did not believe they were counsel, conducted no investigation, did not provide the expert or the court with any information about Appel, and did not litigate competency determination in any way); *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (holding prejudice was presumed when attorney "did not consult with him, had no knowledge of the facts, and acted as a mere spectator" at the resentencing hearing); *Childress v. Johnson*, 103 F.3d 1221, 1228-32 (5th Cir. 1997) (applying the *Cronic* presumption when "counsel provided no meaningful assistance whatsoever, except with respect to the waiver of jury trial"); *Rickman v. Bell*, 131 F.3d 1150, 1155-60 (6th Cir. 1997) (finding that the constructive denial of counsel where attorney's "performance was so outrageous that it is not necessary for us to decide whether we can impute actual bad faith to him"); *Mitchell v. Mason*, 325 F.3d 732, 741-44 (6th Cir. 2003) (finding that "[w]hen counsel is appointed but never consults with his client and is suspended from practicing law for the month preceding trial, and the court acquiesces in this constructive denial of counsel by ignoring the defendant's repeated requests for assistance, *Cronic* governs").

What happened in Mr. Rolle's cases was comparable, if not more severe, than the cases in which courts have found *Cronic* error. This Court should find that Mr. Rolle experienced a "complete denial of counsel," and that his case was not subjected to "meaningful adversarial testing." *Cronic*, 466 U.S. at 659. No inquiry into harmlessness could justify or cure these errors—the cost of litigating their effect here is unjustified. That is why the *Cronic* exception applies. And that is why this Court should find that Mr. Rolle's cases are *per se* reversible. The 2017 case should be remanded for a new trial, and the 2009 case for a new revocation hearing, where Mr. Rolle should be represented by new counsel.

## II.    The district court erred by imposing the 2-level guidelines increase under U.S.S.G. § 3C1.2 for reckless endangerment during flight.

A defendant's high-speed flight does not, without more, warrant a reckless endangerment enhancement under the guidelines. Section 3C1.2 demands a 2-level guidelines increase only when "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. Here, the district court adopted erroneous facts about a police chase and ignored trial testimony that establishes that Mr. Rolle's high-speed acceleration away from officers did not warrant the § 3C1.2 enhancement.

This Court has held that "[i]t is obvious from the text of section 3C1.2 that flight alone is insufficient to warrant an enhancement under this section," which "requires that the defendant recklessly create a substantial risk of death or serious bodily injury to another person." *United States v. Wilson*, 392 F.3d 1243, 1247 (11th Cir. 2004) (internal quotations and citation omitted). This Court has held that driving a vehicle at a higher rate of speed can constitute reckless disregard for others' safety, but only "in an area where people are likely to be found." *United States v. Washington*, 434 F.3d 1265, 1268 (11th Cir. 2006).

In *Washington*, the district court had viewed surveillance video from the defendant's evasion from police "at a higher rate of speed," and found that when "the defendant entered [an] underground parking garage," there were "[c]ars . . . coming in, and persons were getting on the garage elevator." 434 F.3d at 1268. This Court reiterated that flight alone was insufficient, and defined "reckless" to be "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id*. at 1267 (citing U.S.S.G. §§ 2A1.4 cmt. 1, 3C1.2 cmt. 2) (internal quotations omitted). This Court held that the defendant's conduct met the definition of reckless behavior, and that "[d]riving a car at high speed in an area where people

are likely to be found constitutes reckless disregard for others' safety" under § 3C1.2. *Id*.

Similarly, in *United States v. Pardo-Gerena*, testimony had established that the defendant "pulled out of [a] parking lot, forcing [the agent] to swerve to avoid a collision. Then . . . turned onto a public street going approximately 50 or 60 miles per hour on icy roads." 621 F. App'x 607, 613 (11th Cir. 2015). This Court held that the defendant had recklessly created a substantial risk of death or serious bodily injury. *Id*. In *United States v. Martin*, this Court upheld the enhancement when the defendant "veered around another officer's vehicle, which had its blue lights activated, struck a parked vehicle, continued driving at a high rate of speed until he hit a curb and blew a tire, and fled on foot into a female's nearby apartment." 264 F. App'x 857, 858 (11th Cir. 2008). And in *United States v. Gonzalez*, this Court found reckless endangerment when the defendant "operated his vehicle, in reverse, at a high rate of speed on a residential street" near a pre-school. 71 F.3d 819, 837 (11th Cir. 1996), *abrogated on other grounds by Davis v. United States*, 132 S. Ct. 2419 (2011).

Unlike those cases, here there was no reckless creation of a substantial risk of death or serious bodily injury to another person. The defense objected to the reckless endangerment enhancement paragraph in the PSR and reiterated its objection at the sentencing hearing. PSR at 31-32; Doc. 166 at 4. The government responded:

There was testimony in the case that Mr. Rolle sped away from the officers at a high rate of speed. Fortunately, in this case, because of the StarChase deployment, officers did not have to follow the defendant at that high rate of speed in order to catch up with him. But, in any event, he sped away from them at a high rate of speed . . .

*Id*. at 5. This was an accurate statement of the testimony. But the government continued, "and there was a police chase in this case at least till the time that Mr. Rolle thought he was no longer being followed." *Id*. This was an inaccurate statement of the testimony.

The testimony was that TAC unit Officers Zachary Evans and Jeffrey Staudenmaier responded in a vehicle equipped with StarChase, maneuvered behind the blue Hyundai, and activated police lights and sirens. Doc. 160 at 154; Doc. 164 at 25. The Hyundai did not stop, accelerated away from the police "at a high rate of speed," and Officers Evans and Staudenmaier deployed StarChase. Doc. 160 at 154; Doc. 162 at 84. The TAC unit "**let [the Hyundai] go**" and watched for the car to "start driving normal speeds." Doc. 160 at 160. When officers "obtained [an] eye" on the Hyundai **a few minutes later, it "was not" travelling at a high rate of speed**. Doc. 164 at 27. In fact, **the Hyundai was "slowing down, stopping at red lights," and "was stuck in traffic, and . . . observing all traffic laws."** Doc. 81 at 128; Doc. 53 at 129 (emphasis added).

The trial testimony also established that Officers Williams and Ring called in the TAC unit team equipped with "StarChase" to **avoid** a high-speed chase with the

48

Hyundai. Doc. 160 at 153; Doc. 164 at 24. Indeed, the government established that TAC unit officers routinely use StarChase, because it "avoids us getting into a high-speed pursuit, which could ultimately lead to safety issues or danger for the general public with people fleeing the police and running red lights as well as us having to go high speed in a very unsafe driving pattern." Doc. 53 at 38. Ultimately, "if we try to pull someone over and they don't stop, they take off, they accelerate at a high rate of speed, we don't want to engage in pursuit of them because it's a danger to the public." Doc. 160 at 153. According to officers:

> The purpose of this technology is so that we don't engage in a high-speed pursuit, which is a great danger to the public, to ourselves, and, in addition, to the individual in the fleeing car. **If we can back off and not chase them, then they will drive under normal traffic and won't be running red lights and excessively speeding, causing a danger to the public**.

Doc. 81 at 125 (emphasis added). Instead, officers "apprehend them as soon as we can after they've slowed down," which, according to the government during a closing argument, "**avoid[s] the safety issues inherent in high-speed chases**." Doc. 160 at 154; Doc. 55 at 197 (emphasis added).

The district court overruled the defense's objection to the reckless endangerment enhancement, and found that "the preponderance of the evidence supports" the government's resuscitation of "those facts," and "accordingly, would support the enhancement for . . . creating a risk of bodily injury by reason of his fleeing." Doc. 166 at 7. In so doing, the district court adopted erroneous facts about

49

a police chase and ignored trial testimony that established Mr. Rolle's high-speed acceleration away from officers did not meet the definition of "recklessness," the plain language of § 3C1.2, or this Court's precedent.

Mr. Rolle's behavior was briefer and less dangerous than that in *Washington*, *Pardo-Gerena*, *Martin*, or *Gonzalez* which makes sense because law enforcement orchestrated the traffic stop to ensure it did not endanger them or the public. Unlike those cases, the testimony here shows that Mr. Rolle's acceleration away from the traffic stop was the "flight." During that brief flight from officers, testimony does not establish that any police were in harm's way or that people were likely to be found near the traffic stop. For those few moments, there was no traffic accident, no erratic driving pattern, and no off-road driving. StarChase was developed to avoid reckless endangerment, and it worked. Mr. Rolle fled, but no high-speed chase occurred. Instead, Mr. Rolle quickly resumed normal driving behavior and safely parked his car in an apartment complex. The facts here simply do not establish that during the momentary acceleration away from officers Mr. Rolle exhibited a gross deviation from the standard of care that a reasonable person would exercise in such a situation, creating a substantial risk of death or serious bodily injury to another person. *Cf. United States v. Lackey*, 617 F. App'x 310, 314 (5th Cir. 2015) (rejecting a reckless endangerment enhancement because "although [a] pursuit and [a] red-light traffic violation occurred in a residential area, there [was] no evidence

whatsoever showing that the area was populated with other drivers or pedestrians"); *United States v. Woodcock*, 167 F. App'x 693, 695 (9th Cir. 2006) (rejecting applying the reckless endangerment guideline when the defendant drove "at an 'increased' speed near a mobile home park" where the was "no evidence . . . of the proximity of other individuals").

The guidelines range and Mr. Rolle's 210-month sentence was driven by the offense conduct, and not the Career Offender enhancement, which the district court only addressed after finding "the appropriate guidelines score is a 32-VI," and stating the advisory imprisonment range. Doc. 166 at 4-8, 19 ("[B]ecause they do reach the same result . . . I didn't reach [the Career Offender] issue, but it does appear that Chapter 4 would be applicable and would result in . . . the same scoring result."). Indeed, the district court discussed several matters during its imposition of sentence, but the Career Offender enhancement was not one of them. *Id*. at 19-22. Thus, the Chapters 2 & 3 guidelines were the "starting point" and "the lodestar," which "inform[ed] and instruct[ed] the district court's determination of an appropriate sentence." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016) ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."). Mr. Rolle's judgment in the 2017 case should

be vacated and his case remanded for resentencing without the 2-level enhancement for reckless endangerment during flight.

## CONCLUSION

Mr. Rolle respectfully asks this Court to reverse his conviction in the trial case, and adjudication in the violation case, and remand the cases for a new trial, and a new revocation hearing, with new counsel. Alternatively, Mr. Rolle respectfully asks this Court to vacate the trial case's judgment, and remand for a new sentencing.

Respectfully submitted,

Donna Lee Elm
Federal Defender

Rosemary Cakmis
Chief, Appellate Division

*/s/ Jenny L. Devine*

Jenny L. Devine
Florida Bar No. 0647616
Research & Writing Attorney
Office of the Federal Defender
400 North Tampa St., Ste. 2700
Tampa, Florida  33602
Telephone:   (813) 228-2715
Facsimile:    (813) 228-2562
Counsel for Appellant Rolle

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Under Fed. R. App. P. 32(g), I certify this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,658 words according to Microsoft Word's word count, excluding the parts exempted by Fed. R. App. P. 32(f).

**CERTIFICATE OF SERVICE**

I certify that on this 8th day of July, 2019, a true copy of the Initial Brief was filed with the Clerk of the Court using the CM/ECF systems, which will send notice of the electronic filing to: Todd Grandy, AUSA.

/s/ *Jenny L. Devine*

Jenny L. Devine
Research & Writing Attorney

# Addendum A

| Orange County | ICJIS Arrest Affidavit | | |
|---|---|---|---|
| | Document #: 775690 | Division #: CRA  (A) | |
| Arrested ☑   At- Large ☐   JRA ☐ | | Court Case #: 48-2017-MM-009328-A-O | |
| Document Date:  10/07/2017 | | | |

| Location of Defendant Vehicle: | JOHNSON WRECKER | | Date-Time Booked: | 10/07/2017 22:45 | Agency Case Number: | 2017-394917 |
|---|---|---|---|---|---|---|
| (ORI) : FL0480400 | Agency Name: | Orlando Police Department | | FCIC/NCIC Check: ☑ | Date-Time of Arrest: | 10/07/2017 21:12 |
| Address of Arrest: | S. JOHN YOUNG PKWY./L.B. MCLEOD RD. | | | | | |

| DEFENDANT | Adult ☑   Juvenile ☐ | Jacket Number: | | Inmate Number: | 17028910 | Language: | ENGLISH |
|---|---|---|---|---|---|---|---|
| NAME (L,F,M): | DICKERSON, NICOLE BLAIR | | A.K.A: | | | Race: W | Sex: F | DOB: ▓ | Age: ▓ |

| Height: 5'09" | Weight: 240 | Hair: BLN | Eyes: BRO | POB City: ORLANDO | POB State: FL | POB Country: US |
|---|---|---|---|---|---|---|
| RES Street#: ▓▓▓ | | | | | | Citizenship US |
| City: ORLANDO | | State: FL | Zip: ▓ | Home Phone: | Other Phone: (407) 456-1049 | |
| Scars/Tattoos: ▓ | | | | | Ethnicity: NON HISPANIC | |
| Driver's License/ State ID No: ▓▓▓ | | State: FL | Year Expires: 2026 | SSN #: ▓▓▓ | | |
| Business and Occupation: | | | | Bus Phone: | | |
| Bus Street#: | | City: | | State: | Zip: | |
| Next of Kin Name: | | | | Phone: | | |
| Next of Kin Street#: | | City: | | State: | Zip: | |

| AGGRAVATORS: | Firearm ☐ | Weapon ☐ | Mask ☐ | Vest ☐ | Convicted Sex Batterer ☐ | Hate Crime ☐ | Special Victim? ☐ | Domestic Violence? N |
|---|---|---|---|---|---|---|---|---|
| OFFENSES: | Felony ☐ | Misd. ☐ | ORD. ☑ | Traffic ☐ | Out of County ☐ | Court Location: COUNTY#1 | Originating /ORANGE State/County: | |

| No. | GOC Code | Description | Count | Bond Amt $ / Status | FSS/ORD | FDLE Rec# | Drug Name | Citation Number |
|---|---|---|---|---|---|---|---|---|
| 1 | | RESISTING OFFICER WITHOUT VIOLENCE    843.02 | 1 | 500.00 | 843.02 | 3143 | | |

| DCF Notified? N | By Whom? | On Probation? N | Miranda Warning? N | By Whom? | | Invoked? N |
|---|---|---|---|---|---|---|

| Sworn to and subscribed before me , this 7 day of October year 2017 | I swear or affirm the above statements are correct and true | (407) 246-2816  Officer's Bus. Phone No. |
|---|---|---|
| Notary Public ☑   Law Enforcement or Corrections Officer ☐ | Officer's Signature — | AVIGNON, STANLEY / 19509  Officer's Name/ID |
| Personally Known ☐   Produced Identification ☐ | | |
| Type of Identification | Notice to Defendant Regarding Social Security Numbers: This Law Enforcement Agency is collected your social security number (SSN) as required by FSS 119.071. This agency will use it for the purpose of confirming your identity, and sharing it with other governmental agencies to identify records linked to the SSN. This collection and use of your SSN is required for this agency to fulfill its lawful duties and responsibilities. | |
| Notary Signature  Swootes | NOTARY PUBLIC STATE OF FLORIDA | WEST, SIMOANE R  Notary Name | GG043712 / 10/31/2020  Notary Commission # / Exp. Date |

1001 (09/12)

10/8/2017 10:05 AM FILED IN THE OFFICE OF TIFFANY M. RUSSEL CLERK OF CIRCUIT COURT ORANGE COUNTY FL

| Orange County | ICJIS Arrest Affidavit (continued) | Division #: CRA |
|---|---|---|
| Arrested ☑  At-Large ☐  JRA ☐ | Document #: 775690 | Court Case #: 48-2017-MM-009328-A-O |
| Document Date: 10/07/2017 | | |
| Defendant's Name  DICKERSON, NICOLE BLAIR | | Agency Case Number: 2017-394917 |

**NARRATIVE:** The undersigned has probable cause to believe the above-named defendant on the ___07___ of October 2017 at ___0:00___ at S. JOHN YOUNG PKWY. (Zone: ___g8___ ) in Orange County did

On October 7, 2017 at approximately 2000 hours Officer Thomas (19006) and I Officer Avignon (19509) were actively patrolling in the area of South John Young Parkway and Lb McLeod Road in our unmarked Orlando Police Patrol Vehicle. We noticed a silver Audi (FL Tag#295TEP) driving south on South John Young Parkway approaching LbMcleod Road at a high rate of speed.

The vehicle registration which was displayed on the vehicle was expired and a Teletype checked advised the registered owner of the vehicle, a white female by the name of Nicole Dickerson, had a suspended driving license.

We activated our emergency light and conducted a traffic stop with the vehicle coming to a complete stop on South John Young Parkway under the I4 overpass. It should be noted under the I4 Overpass is very poorly laminated due the fact that there are currently no working street lights.

Dressed in our Orlando Police TAC uniforms with the words police written in the front and rear of the uniforms we approached the vehicle. I walked up to the passenger side of the vehicle as Officer Thomas made contact with the driver who identified herself as Nicole Dickerson. The vehicle had dark tints which, added to the poor lighting condition under the over pass, made it difficult for me see inside the vehicle. This created a dangerous environment for both Officer Thomas and I since I could not see if there were any weapons or other occupants inside the vehicle. I asked Officer Thomas to tell Dickerson to put window. Dickerson refused.

I heard Officer Thomas tell Dickerson two more times to put the window of the vehicle down, but Dickerson continued to refuse and stated she did not have to.

Since Dickerson refused to put the window down, and we still had poor visibility inside the vehicle, I ordered Dickerson to step out of the vehicle. Dickerson once again refused. Dickerson stated she is a defense attorney for Orange County and knows her rights. I gave Dickerson 2 more verbal commands to get out of the vehicle. Dickerson stated once again she does not have to get out of the vehicle. After refusing all 3 of my commands, I opened the vehicle door and Officer Thomas and I removed Dickerson out of the vehicle.

I placed Dickerson into my department issued handcuffs. I held Dickerson by her left arm while Officer Thomas explained to Dickerson why she was being stopped. Officer Thomas informed Dickerson her licenses was suspended. Dickerson advised it no longer was suspended, she was recently pulled over by an Orange County Deputy and she took care of her license.

Teletype check confirmed Dickerson's license as been suspended since September 27, 2017.

As Officer Thomas continued trying to explain to Dickerson her current situation, Dickerson continued arguing stating "you guys get me clients" "Do you need me to help spell your reports" and "I make way more money than you". Dickerson kept tensing her arms up, trying to pull away from my grasp causing me to hold up by both her right and left arm. I ordered Dickerson to stop pulling away from me. Dickerson refused to obey my orders and continued pulling away as she continued to argue. I told Dickerson 3 more times to stop pulling away, and Dickerson continued to refuse. By the fourth time, I explained to Dickerson that I do not want to have to use force to restrain her, but would have too if she keeps pulling away. Dickerson continued to refuse my lawful commands and was placed under arrest.

Due to the fact that Dickerson refused to obey our law full commands to step out of the vehicle, and actively continued pulling away from my grasp after being arrested, probable cause was established to charge Dickerson with resisting arrest without violence.

Dickerson received a Uniform Traffic Citation (#A32I1RP) for driving while license suspended FSS 322.34(1) and another Uniform Traffic Citation (#A32I1SP) for improper display of tag FSS316.605(1).

| Sworn to and subscribed before me , | I swear or affirm the above statements are correct and true | (407) 246-2816 |
|---|---|---|
| this ___7___ day of ___October___ year ___2017___ | Officer's Signature = | Officer's Bus. Phone No.  AVIGNON, STANLEY / 19509 |
| Notary Public ☑   Law Enforcement or Corrections Officer ☐ | | Officer's Name/ID |
| Personally Known ☑   Produced Identification ☐ | *Notice on Defendant Regarding Social Security Number:...* | |
| Type of Identification | | |
| Notary Signature | NOTARY PUBLIC STATE OF FLORIDA | WEST, SIMOANE R |  GG043712 / 10/31/2020 |
| | | Notary Name | Notary Commission # / Exp. Date |

1001 (09/12) | Page 2 of 4

10/8/2017 10:05 AM FILED IN THE OFFICE OF TIFFANY M. RUSSEL CLERK OF CIRCUIT COURT ORANGE COUNTY FL

| Orange County | ICJIS Arrest Affidavit (continued) | Division #: CRA |
|---|---|---|
| Arrested ☑  At- Large ☐  JRA ☐ | Document #: 775690 | |
| Document Date: 10/07/2017 | | Court Case #: 48-2017-MM-009328-A-O |

Dickerson was transported to BRC.

It shall be noted while at BRC, Dickerson stated "how many of my own color do I have to arrest to get promoted. I do not have to be an uncle Tom to make money at my job" and "I would love to get some of OPD's money".

Sergeant Whited (16898) was advised of the incident.

The vehicle was towed to Johnson's Wrecker.

| Sworn to and subscribed before me , | I swear or affirm the above statements are correct and true | |
|---|---|---|
| this  7  day of  October  year  2017 | | (407) 246-2816 |
| | Officer's | Officer's Bus. Phone No. |
| Notary Public ☑    Law Enforcement or Corrections Officer ☐ | Signature ⇒ | AVIGNON, STANLEY / 19509 |
| Personally Known ☐    Produced Identification ☐ | | Officer's Name/ID |
| Type of Identification | | Notice to Defendant Regarding Social Security Number: This Law Enforcement Agency has secured your social security number (SSN) as required or authorized by law and will use your SSN only for those purposes required or authorized by law. |
| Notary Signature | NOTARY PUBLIC STATE OF FLORIDA | WEST, SIMOANE R | GG043712 / 10/31/2020 |
| | | Notary Name | Notary Commission # / Exp. Date |

1001 (09/12)

Filing # 63644518 E-Filed 11/02/2017 09:50:04 AM

IN THE COUNTY COURT OF ORANGE COUNTY, STATE OF FLORIDA

THE STATE OF FLORIDA                    INFORMATION #   48-2017-MM-009328-O

VS.                                     DIVISION - 80

NICOLE BLAIR DICKERSON                  1.   RESISTING OFFICER WITHOUT
                                             VIOLENCE (M1)

---

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

ARAMIS D. AYALA, State Attorney of the Ninth Judicial Circuit prosecuting for the

State of Florida in Orange County, or ARAMIS D. AYALA, State Attorney of the Ninth Judicial Circuit

prosecuting for the State of Florida in Orange County, by and through the undersigned Designated

Assistant State Attorney, under oath, CHARGES that NICOLE BLAIR DICKERSON, on or about the

7th day of October, 2017, in said County and State, did, in violation of Florida Statute 843.02, resist,

obstruct or oppose LANDON THOMAS or STANLEY AVIGNON, a law enforcement officer for the

Orlando Police Department, in the lawful execution of a legal duty, to-wit:  an investigation or the arrest

of said defendant, without offering or doing violence to the person of the said LANDON THOMAS or

STANLEY AVIGNON, by failing to comply with a lawful command of said officer or by struggling to

avoid the application of handcuffs.

This information encompasses the transaction and all charges listed on Complaint
Number 48-2017-MM-009328-O. The Orange County Sheriff's Office and the
Orange County Corrections Department shall substitute the charge(s) indicated on
the information for those on the above cited complaint.  The bond(s) shall remain
the same as that last set on 48-2017-MM-009328-O.

STATE OF FLORIDA
COUNTY OF ORANGE                              ARAMIS D. AYALA, State Attorney
                                             Ninth Judicial Circuit of Florida
    Personally appeared before me Eduardo Faria, Assistant State
Attorney of the Ninth Judicial Circuit of Florida, who being first duly    By _____
sworn, says that the allegations set forth in the foregoing                 Eduardo Faria
INFORMATION are based upon facts that have been sworn to as              Designated Assistant State Attorney
true, and which if true, would constitute the offense therein charged,   Florida Bar No. 119144
and that he/she institutes this prosecution in good faith.
    The foregoing instrument was acknowledged before me
this _____ day of __November__ 20_17_ by the                                              EF/EF
aforementioned Assistant State Attorney who is
personally known to me and who did take said oath.



ARLEEN MORENO
Commission # GG 151830
Expires November 13, 2019
Bonded Thru Budget Notary Services

Page 1 of 1                                                      S.T. 01/04/18

**IN THE COUNTY COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA**

## CRIMINAL TRIAL MINUTES

**COURT OPENED** at 9:29 A.M. on March 8, 2018 with the following officers

present:  Honorable Wayne Shoemaker, Circuit Judge presiding; Janice Chon

and Stephanie Reyes, Assistant State Attorney; Latricia Hankerson, Deputy

Clerk; John Krauss, Court Deputy; Electronic court reporter.

## STATE OF FLORIDA VS DICKERSON, NICOLE 2017-MM-9328-A-O

Charged with: 1) RESISTING OFFICER WITHOUT VIOLENCE

The defendant, Nicole Dickerson, appeared with Counsel, Jeffery Lotter having

previously entered a plea of not guilty herein.

Jury selection commenced.

The following Jurors were called, sworn, and accepted:

1) Jean-Louis, Erica

2) Shaw, Kristie

3) Lizarde, Briana

4) Martinez, Mariana

5) Zanfardino, Ralph

6) East, Anna

Alternate: No Alternate

The State and Defense presented opening statements

Officer Stanley Avignon, with Orlando Police Department TACT Unit, was sworn

and testified on behalf of the State.

Officer Landon Thomas, with Orlando Police Department, was sworn and

testified on behalf of the State.

The State Rested its Case.

Outside the present of the Jury the Defense entered a motion for Judgment of

Acquittal.

Said Motion was Hereby Denied.

Defendant Nicole Dickerson, testified on her own behalf.

Defense Rested its case.

**COURT RECESSED** at 6:00 P.M. on March 8, 2018 to reconvene on March 9,
2018 at 9:45 a.m.
**COURT OPENED** at 10:00 A.M. on March 9, 2018, pursuant to call, with all
officer's present.

The State and Counsel for Defense presented closing arguments to the Jury.

The Jury was charged and retired for deliberations.

The Jury returned with the following verdicts, to wit:

## VERDICT

"WE THE JURY, find the Defendant, NICOLE BLAIR DICKERSON  Guilty of the

charge of Resisting Officer Without Violence in violation of Florida Statute

843.02.

SO, SAY WE ALL.

DATED AT ORLANDO, ORANGE COUNTY, FLORIDA, ON THIS 9th DAY OF

March 9, 2018.

/s/ Mariana Martinez

Foreperson"

The defendant was adjudicated guilty and sentenced to:

10 days Orange County Jail with credit for 2 days' time served, 8 Days

Suspended on the condition that the defendant completes 100 Hours Alternative

Community Service by 10/7/18. Defendant to pay fines and court costs.

The Jury was discharged.

COURT RECESSED at 12:45 p.m. on March 9, 2018 .

Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Court
Done and filed in open court.
By: _____ Deputy Clerk in Attendance
Latricia Hankerson, D.C.

STATE OF FLORIDA

VS.

NICOLE BLAIR DICKERSON, Defendant

DOB: ▓▓▓▓▓▓

IN THE COUNTY COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2017-MM-009328-A-O
DIVISION: Orlando - CR

## ORDER OF DISPOSITION

This cause coming on this day for: **Trial**, with Asst State Attorney, J. Chon and S. Reyes, present and you, the defendant, **NICOLE BLAIR DICKERSON** being now Present **and represented by JEFFERY LOTTER** Present , you have:

**001. RESISTING OFFICER WITHOUT VIOLENCE - 843.02 - First Degree - Misd - entered a plea of Not Guilty/Deny, and having been found guilty 2 - Adjudicated Guilty Jury Trial**

**CONFINEMENT:**
**You are hereby ordered to serve 10 Days in the Orange County Jail with credit for 2 Days time served. The Court Suspended 8 Days of the Jail Sentence on the Condition that Defendant Completes 100 ACS Hours by 10/07/2018.**
**ALTERNATIVE COMMUNITY SERVICE:** Defendant to perform 100 hours. Complete by 10/07/2018.

Write a Letter of Apology

Officer Stanley Avignon and Officer Landon Thomas by 05/10/2018 with Proof to Clerk of Court

| Hearing Type | Judge | Date | Time | Location | Comments |
|---|---|---|---|---|---|
| Status Hearing | Shoemaker, Wayne J | Monday, October 22, 2018 | 9:00 AM | Room 7-C On The 7th Floor | Re: Proof of Completion of ACS Hours |

Court Minutes
State Witness Sworn and Testified

Defense Witness Sworn and Testified
Motion

Motion for Mistrial
Defendant Found Guilty
Minutes Jury
Case Closed as to All Counts
Pay Balance Due

Officer Stanley Avignon with Orlando Police Department TACT Unit and Officer Landon Thomas with Orlando Police Department.
Nicole Dickerson.
Oral Motion for Reversal of Guilty Verdict is Denied.
Oral Motion is Denied.
by Sworn Petit Jury.

by: 05/10/2018

**FINES AND COSTS AS TO THIS CASE:**
Pay fine / costs totaling:  $688.00 [Fine & Surcharge: $315.00 Orlando PD: $100.00 Court Costs: $223.00 State: $50.00]

DONE, ORDERED and FILED in Open Court on March 9, 2018

Honorable Judge: _____

**Wayne J Shoemaker**

Page 1 of 2

NICOLE BLAIR DICKERSON ███████████
ORLANDO, FL, ████

Deputy Clerk in Attendance:  Jessica D, Latricia H.
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts



State of Florida, County of Orange
I hereby certify that the foregoing is a true and correct instrument filed in this office. Confidential
or sealed items, if any, have been removed per FLA.R.Jud.Admin. 2.420. Witness my hand and
official seal this March 9, 2018 Tiffany Moore Russell, Clerk of Circuit Court by: Jessica D, Latricia H.

COPIES TO:
_____ Probation Email    _____ ACS         _____ State Atty    _____ Defense Atty
_____ Dockets            _____ C.F.S.C.    _____ Other         _____ Defendant

**If you are a person with a disability who needs any accommodation in order
to participate in this proceeding, you are entitled, at no cost to you, to the
provision of certain assistance.  Please contact the ADA Coordinator, Human
Resources, Orange County Courthouse, 425 N. Orange Avenue, Suite 510,
Orlando, Florida, (407) 836-2303, at least 7 days before your scheduled court
appearance, or immediately upon receiving this notification if the time before
the scheduled appearance is less than 7 days; if you are hearing or voice
impaired, call 711.**

PAYMENT LOCATIONS:

| | | Northwest Branch |
| --- | --- | --- |
| **Downtown** | | 1111 N. Rock Springs Rd. |
| 425 N. Orange Ave., Suite 250/410 | | Apopka, FL. 32703 |
| Orlando, FL. 32801 | **Northeast Branch** | Monday through Friday |
| Monday through Friday | 450 N. Lakemont Ave. | |
| | Winter Park, FL. 32792 | |
| **West Orange Branch** | Monday through Friday | |
| 475 Story Rd. | | **Goldenrod Branch** |
| Ocoee, FL. 34761 | | 684 Goldenrod Road |
| Monday through Friday | | Orlando, FL 32822 |
| | | Monday through Friday |

STATE OF FLORIDA
VS.

IN THE COUNTY COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2017-MM-009328-A-O
DIVISION: Shoemaker, Wayne J

NICOLE BLAIR DICKERSON, Defendant

DOB: ▓▓▓▓▓▓

## ORDER

This cause coming on this day for: **Hearing**, with Asst State Attorney, J. Chon, present and you, the defendant, **NICOLE BLAIR DICKERSON** being now Present **and represented by JEFFERY LOTTER** Present **B. Sandor**, you have:

| Count: 001 | RESISTING OFFICER WITHOUT VIOLENCE | 843.02 | First Degree - Misd |
|---|---|---|---|

**COURT ORDERS:**
Court Minutes
Per the Court:

Defendant is Ordered to Report to Orange County Jail by 5PM Today 09/21/2018 to Serve 8 Days in Orange County Jail.

DONE, ORDERED and FILED in Open Court on September 21, 2018

**Honorable Judge:**

**Wayne J Shoemaker**

NICOLE BLAIR DICKERSON ▓▓▓▓▓▓
ORLANDO, FL, ▓▓▓

Deputy Clerk in Attendance:
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

State of Florida, County of Orange
I hereby certify that the foregoing is a true and correct instrument filed in this office. Confidential or sealed items, if any, have been removed per FLA.R.Jud.Admin. 2.420. Witness my hand and official seal this September 21, 2018 Tiffany Moore Russell, Clerk of Circuit Court by:

COPIES TO:
____ Probation Email    ____ ACS    ✗ State Atty    ✗ Defense Atty
✗ Dockets    ____ C.F.S.C.    ____ Other    ✗ Defendant

# Addendum B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Possession and Use of Personal                    General Order
Electronic Devices in Federal                      6:13-mc-94-Orl-22
Courthouses in the Middle
District of Florida

---

## ORDER TO SHOW CAUSE

This cause is before the Court *sua sponte*. On September 4, 2018, an incident occurred involving defense attorney Nichole Blair Dickerson and the unauthorized use of Ms. Dickerson's cellphone by an individual sitting in the gallery during a jury trial in Courtroom #5A. (*See* Attachment A Incident Report). The individual was later identified as Knalia Edwards. A Court Security Officer approached Ms. Edwards to inquire whether she was authorized to have an electronic device in the courtroom. (*Id.*; *see also* Attachment B, *In re: Possession and Use of Personal Electronic Devices in Federal Courthouses in the Middle District of Florida*, General Order 6:13-mc-94-22, at 1–2 (M.D. Fla. Sept. 26, 2013) ("**Standing Order**") (outlining the circumstances where an individual may bring an electronic device inside the courthouse, but establishing that authorized individuals may not use electronic devices in a manner that disrupts a judicial proceeding).) Ms. Edwards revealed the cellphone belonged to Ms. Dickerson and then became non-compliant. (*See* Attachment A Incident Report.)

Counsel and their employees or designees are required to be familiar with, and to comply with, the Court's standing orders regarding the use of electronic devices. As is

-1-

clear from the Report, using a cellphone in this manner inside a courtroom is not permitted. *See Standing Order*, 1–2. Failure to abide by the Standing Order is a sanctionable offense. The Incident Report provides grounds for the imposition of sanctions. Before going there, however, the Court will hear from Ms. Dickerson and Ms. Edwards why sanctions should not be imposed for the misconduct.

Accordingly, on Tuesday, **September 18, 2018 at 10:15 a.m.,** attorney Nichole Blair Dickerson is **DIRECTED TO APPEAR** in Courtroom 4A at 401 W. Central Blvd, Orlando FL 32801 before the Court to show cause why sanctions should not be imposed. Furthermore, Ms. Dickerson is **DIRECTED TO BRING** Knalia Edwards with her. The Clerk is **DIRECTED** to send a certified copy of this Order to Nichole Blair Dickerson.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 10, 2018.

ROY B. DALTON JR.
United States District Judge

-2-

U.S. Department of Justice
United States Marshals Service

**Court Facility Incident Report**

INSTRUCTIONS: Use Form CSO-003 to report disruptive incidents in the courthouse. See last page for detailed instructions. Submit completed report to the District Judicial Security Inspector for notification.

| 1. DATE OF REPORT: | 2. DATE OF INCIDENT: | 3. TIME OF INCIDENT: | 4. GSA BUILDING NO.: |
|---|---|---|---|
| 09/05/2018. | 09/04/2018.. | 1440 Hours | 18-K |

| 5. BUILDING NAME: | 6. BUILDING ADDRESS: |
|---|---|
| George C. Young - Annex | 401 West Central Blvd. Orlando Fl. 32801 |

| 7. WAS SUBJECT DETAINED? | 8. REPORTING DISTRICT: | 9. REPORTED BY: |
|---|---|---|
| ☐ Yes  ☒ No | Middle/FL. Orlando | LCSO STEWARD PEREZ |

10. TYPE OF INCIDENT *(Check applicable box)*:

| | | |
|---|---|---|
| ☐ Alarm Activation | ☐ Medical Emergency | ☐ Suspicious Vehicles (Perimeter Areas) |
| ☐ Assault | ☐ Missing Property | ☐ Unauthorized Persons |
| ☐ Bomb Threat | ☐ Open/Unsecured Doors | ☐ Vehicle Break-Ins/Burglaries |
| ☐ Contraband | ☐ Property Damage | ☐ Other *(Describe)*: |
| ☒ Disruptive Person | ☐ Security Breaches | |
| ☐ Forced Entry | ☐ Shooting | |
| ☐ Illegal Weapon | ☐ Suspicious Individuals on Perimeter | |
| ☐ Malfunctioning Equipment *(alarms, elevators, garage doors, security lighting, etc.)* | ☐ Suspicious/Unattended Package | |

11. CHECK APPLICABLE BOX:

☒ Initial Report        ☐ Follow-Up Report        ☐ Addendum - Initial Report Dated:

12. INCIDENT DESCRIPTION *(Details should cover who, what, where, when and how)*:

On September 4th, 2018 at approximately 1440 hours, at 401 W. Central Blvd. Orlando, Fl 32801 in courtroom # 5A, was a jury criminal trial going on USA v. Prince Toburas Jermaine Rolle. I received a text on my cellphone from Deputy U.S. Marshal saying quote "there is a black female wearing a white striped pajama looks outfit with tattoos on her legs sitting in the gallery in Judge Presnell's courtroom with a cellphone or some electronics devises. She is possible the defense attorneys paralegal but is not authorized to have electronics in the courtroom." I responded to the location as soon I read the text. Upon my arrival to the scene, I observed a female subject with the same description sitting in the gallery behind the defense attorney Nichole Blair Dickerson's table, with cellphone- texting. The flash light bulb attached to the cellphone was activated. Every time the subject received a notification from text the light illuminated the courtroom. This actions was disturbing individuals in the courtroom , witnesses and observants trying to listen the opening statements from the Assistant U.S. Attorney Boggs. At that moment I approached the subject and instructed her to follow me. I insisted few time before she complied to follow me to the foyer of the courtroom in front of the witness room. I asked her if she is an attorney and if she was authorized to have electronics in court. She replied is not a lawyer and the cellphone she used belong to the defense attorney Nichole Blair Dickerson. I asked her to wait outside the courtroom until I clear about the cellphone with the attorney but she do not want to comply, I asked her for government issued identification, she refused to produce it. At this moment her demeanor changed and tried to go around me to enter the courtroom, I blocked her access standing by entrance courtroom doors, she said out loud quote " You are an ass whole" I asked her to leave the building in which she voluntary complied and left with no resistance. DUSM Larry Brown was notified.

13. REPORT PAGES:

REPORT CONTINUED ON  NA        ATTACHED PAGES

*I hereby certify that the information stated herein is true, complete, and accurate to the best of my knowledge.*

| 14. SIGNATURE OF PREPARER: *LCSO Stewerd P.* | 14a. DATE: 9/05/2018. |
|---|---|
| 15. APPROVED BY - NAME: | 15a. TITLE: | 15b. DATE: 9/05/2018. |

18. DISTRIBUTION:   DISTRICT COTR - 1 COPY / OCS - 1 COPY

Form CSO-003
Rev. 09/12

FILED

## United States District Court
## Middle District of Florida

13 OCT -1  PM 12: 27

In re:

Possession and Use of Personal
Electronic Devices in Federal
Courthouses in the Middle
District of Florida

General Order

6: 13-mc-94-orl-22

---

This Order sets forth the Court's policy concerning the possession and

use of personal electronic devices in the federal courthouses in the Middle

District of Florida.  Personal electronic devices are things like cellular

telephones, "smart phones," laptop computers, and tablet computers.

### 1.    General Policy

No one may bring a personal electronic device beyond a courthouse's

security checkpoint.

### 2.    Exceptions

The following exceptions to the general policy apply.  Any personal

electronic device carried beyond a courthouse's security checkpoint based on

an exception remains subject to inspection, to Fed. R. Crim. P. 53 (prohibiting

courtroom photography and broadcasting in criminal cases), and to Local

Rule 4.11(a)(2) (prohibiting courtroom photography and broadcasting in all

cases).  Further, any person who brings in a personal electronic device under

an exception, (a) must keep the personal electronic device on silent mode, (b) may not share it with anyone, (c) may not use it in a manner that disrupts any judicial proceeding, (d) may not use it to search for information about a potential or seated juror, and (e) may not bring it into the courtroom for the United States Court of Appeals for the Eleventh Circuit in the Bryan Simpson United States Courthouse in Jacksonville.

### 2.1.  Court-Ordered Permission

Anyone may bring a personal electronic device beyond a courthouse's security checkpoint by presenting an order from a judge of the Court giving him or her permission to do so.  The order must specify the person, place, purpose, and time frame.

### 2.2.  Employees

Any agency employee who works in a courthouse office, a U.S. Trustee, any attorney of the United State's Attorney's Office or the Federal Defender's Office, or any law enforcement officer on official business may bring a personal electronic device beyond the courthouse's security checkpoint by presenting valid agency identification.

### 2.3.  Jurors

At the presiding judge's discretion, any seated petit or grand juror may bring a personal electronic device beyond the courthouse's security checkpoint

during his or her service. The juror (a) must store the device in a designated receptacle at all times except during breaks, (b) may use the device only in designated areas or in the jury assembly room; and (c) may use the device only for non-case matters. The judge must provide the United States Marshals Service and the lead Court Security Officer with a memorandum setting forth the list of jurors, the case name, the case number, the beginning date of service, and the expected end date of service.

### 2.4   Attorneys

Any attorney permitted to practice law in the Middle District of Florida may bring any personal electronic device beyond the courthouse's security checkpoint by presenting a valid Florida Bar identification card or *pro hac vice* order. In addition to the restrictions set forth in paragraph 2, attorneys may not use personal electronic devices directly outside of any courtroom when court is in session.

### 2.5   Judicial discretion

Any presiding judge may modify these procedures or suspend any person's privileges granted by this Order at any time for any reason.

**Done and ordered** in chambers in Orlando, Florida, on September 26, 2013.

Anne C. Conway
Chief United States District Judge

c:    Middle District Judges
      United States Marshal
      United States Attorney
      Federal Defender
      Chief Probation Officer
      Clerk of Court

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Possession and Use of Personal                    General Order
Electronic Devices in Federal                      6:13-mc-94-Orl-22
Courthouses in the Middle
District of Florida

_____

### NOTICE AND ORDER

This cause is before the Court *sua sponte*.

In a prior Order To Show Cause, the Court directed attorney Nicole Blair

Dickerson to appear at a hearing to show cause why sanctions should not be imposed for

violating *In re: Possession and Use of Personal Electronic Devices in Federal Courthouses in the*

*Middle District of Florida*, General Order 6:13-mc-94-22, at 1–2 (M.D. Fla. Sept. 26, 2013)

("**Standing Order**"). The hearing was set for Tuesday, September 18, 2018 at 10:15 a.m.

before the Undersigned, and notification of the hearing was sent to Ms. Dickerson by

certified mail. Ms. Dickerson failed to appear.

At the hearing, pursuant to Federal Rule of Criminal Procedure 42(a), the Court

gave notice, memorialized here, that criminal contempt proceedings would be initiated

against her pursuant to 18 U.S.C. § 401 for: (1) violating the Standing Order; (2) failure to

comply with the Court's Order To Show Cause of September 10, 2018 ordering her

appearance before the undersigned; and (3) failing to comply with the Order to pay a

monetary fine imposed by U.S. District Judge Gregory A. Presnell on September 6, 2018.

The Court referred this matter to the U.S. Attorney's Office for prosecution and set it for

-1-

bench trial commencing Wednesday, October 3, 2018 at 9 a.m.

In accordance with the findings made at the September 18 hearing, it is hereby

**ORDERED AND ADJUDGED** that:

1.  In accordance with Federal Rule of Criminal Procedure 42(a)(2), the matter is referred to the United States Attorney's Office for the Middle District of Florida for a determination as to whether it will accept prosecution of criminal contempt proceedings against Ms. Dickerson.

2.  Trial will commence against Ms. Dickerson on Wednesday, **October 3, 2018 at 9 a.m.** in Courtroom 4A of the George C. Young Courthouse, 401 W. Central Blvd, Orlando FL 32801 before the undersigned United States District Judge. **Ms. Dickerson is cautioned that failure to appear will result in the issuance of an arrest warrant.**

3.  The Clerk is **DIRECTED** to send a certified copy of this Order to Ms. Dickerson.

4.  The U.S. Marshal is **DIRECTED** to serve a copy of this Order on Ms. Dickerson at 33 E. Robinson Street, Suite 113, Orlando, FL 32801.

5.  The Clerk is **DIRECTED** to assign a new criminal case number to the contempt matter against Ms. Dickerson that is now pending.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 18, 2018.



ROY B. DALTON JR.
United States District Judge

Copies:
Nichole Blair Dickerson
United States Attorney's Office for the
Middle District of Florida

1           UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2               ORLANDO DIVISION
             CASE NUMBER 6:13-mc-94
3

4    . . . . . . . . . . . . . . ..
                                   :
5    IN RE:  POSSESSION AND USE    :
     OF PERSONAL ELECTRONIC DEVICES :
6    IN FEDERAL COURTHOUSES IN THE  :      Orlando, Florida
     MIDDLE DISTRICT OF FLORIDA     :      September 18, 2018
7                                   :      10:24 a.m.
                                    :
8    . . . . . . . . . . . . . . . .

9           TRANSCRIPT OF SHOW CAUSE HEARING
          BEFORE THE HONORABLE ROY B. DALTON, JR.
10            UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:    Amie R. First, RDR, CRR, CRC, CPE
                        Federal Official Court Reporter
22                      401 West Central Boulevard, Suite 4600
                        Orlando, Florida  32801
23                      AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by mechanical stenography.

25   Transcript produced by Computer-Aided Transcription.

```
 1                    P R O C E E D I N G S

 2                         * * * * *

 3           THE COURT:  All right.  We're here on the Court's

 4   motion on an order to show cause in connection with general

 5   order 6:13-mc-94 as it relates to Nicole Dickerson.

 6           Ms. Dickerson is not present in the courtroom.

 7           On September the 10th of 2018, the Court

 8   entered an order to show cause directing Nicole Blair

 9   Dickerson to appear at the United States District

10   Courthouse in Orlando, Courtroom 4-A, at 10:15 in the

11   morning to show cause why she shouldn't be sanctioned or

12   otherwise held in contempt in connection with her failure

13   to abide by the Court's standing order with respect to the

14   possession and use of personal electronic devices, general

15   order 6:13-mc-94 in connection with a matter that occurred

16   in the courtroom of the United States District Judge

17   Gregory Presnell on or about September the 5th of 2018

18   during the course of a jury trial.

19           The order was served by certified mail.

20   Ms. Dickerson has not responded.

21           So Ms. Dickerson is now in violation of not only

22   the Court's general standing order with respect to

23   electronic devices, she's also failed to respond to the

24   Court's order to show cause to appear.

25           She's also failed to pay a fine that was imposed
```

1  by Judge Presnell by his order of September the 6th,

2  2018, requiring her to pay the Clerk of the Court a fine of

3  $100 for late arrival at trial.

4         So she's now in violation, failed to comply with

5  at least three orders of the United States District Court.

6         Accordingly, it's my intent to proceed under

7  Federal Rule of Criminal Procedure 42(a) with the

8  institution of criminal contempt proceedings against

9  Ms. Dickerson.

10        I'm going to set the matter for trial on

11  Wednesday, October the 3rd, 2018, at 10:15 in the

12  morning.

13        I'm going to provide the written order that will

14  give Ms. Dickerson the notice of the trial to commence on

15  October 3rd, 2018, notifying her of her right to retain

16  counsel to represent her interests in that regard if she

17  wishes.

18        I'm also going to request the United States

19  Attorney to make an appearance to prosecute the matter on

20  behalf of the United States and appear on behalf of the

21  Court in connection with the criminal contempt proceedings.

22        So I'm going to ask the courtroom deputy to

23  reflect in the minutes that Ms. Dickerson is in contempt of

24  the Court for failure to appear and that the contempt

25  proceedings under 42(a) will proceed to trial on October

```
1    the 3rd and have the -- I'm going to ask the Clerk to

2    have the Court have the order served on Ms. Dickerson again

3    by certified mail.

4              So I guess that's about it for this morning.

5              I trust, Mr. Countryman, you've not heard anything

6    from Ms. Dickerson with respect to her appearance here this

7    morning?

8              THE DEPUTY CLERK:  No, Your Honor.

9              THE COURT:  All right.  We'll be in recess.

10             Let me put one more thing on the record.

11             If in the unlikely event that Ms. Dickerson fails

12   to appear on October the 3rd, 2018, in response to the

13   Court's certified order, I will issue a bench warrant and

14   have her taken into custody.

15             (Proceedings adjourned at 10:28 a.m.)

16                            *****

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3         I certify that the foregoing is a correct

 4    transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7    November 13, 2018

 8

 9       s\  Amie R. First
         _____
         Amie R. First, RDR, CRR, CRC, CPE
10       Federal Official Court Reporter
         United States District Court
11       Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Addendum C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Possession and Use of Personal                          General Order 6:13-
Electronic Devices in Federal                            mc-94-Orl-22
Courthouses in the Middle
District of Florida                                      **6:18-cr-215-Orl-37DCI**

_____

## NOTICE AND ORDER

This cause is before the Court *sua sponte*.

In a prior Order To Show Cause, the Court directed attorney Nicole Blair Dickerson to appear at a hearing to show cause why sanctions should not be imposed for violating *In re: Possession and Use of Personal Electronic Devices in Federal Courthouses in the Middle District of Florida*, General Order 6:13-mc-94-22, at 1–2 (M.D. Fla. Sept. 26, 2013) ("**Standing Order**"). The hearing was set for Tuesday, September 18, 2018 at 10:15 a.m. before the Undersigned, and notification of the hearing was sent to Ms. Dickerson by certified mail. Ms. Dickerson failed to appear.

At the hearing, pursuant to Federal Rule of Criminal Procedure 42(a), the Court gave notice, memorialized here, that criminal contempt proceedings would be initiated against her pursuant to 18 U.S.C. § 401 for: (1) violating the Standing Order; (2) failure to comply with the Court's Order To Show Cause of September 10, 2018 ordering her appearance before the undersigned; and (3) failing to comply with the Order to pay a monetary fine imposed by U.S. District Judge Gregory A. Presnell on September 6, 2018. The Court referred this matter to the U.S. Attorney's Office for prosecution and set it for

-1-

bench trial commencing Wednesday, October 3, 2018 at 9 a.m.

In accordance with the findings made at the September 18 hearing, it is hereby

**ORDERED AND ADJUDGED** that:

1.  In accordance with Federal Rule of Criminal Procedure 42(a)(2), the matter is referred to the United States Attorney's Office for the Middle District of Florida for a determination as to whether it will accept prosecution of criminal contempt proceedings against Ms. Dickerson.

2.  Trial will commence against Ms. Dickerson on Wednesday, **October 3, 2018 at 9 a.m.** in Courtroom 4A of the George C. Young Courthouse, 401 W. Central Blvd, Orlando FL 32801 before the undersigned United States District Judge. **Ms. Dickerson is cautioned that failure to appear will result in the issuance of an arrest warrant.**

3.  The Clerk is **DIRECTED** to send a certified copy of this Order to Ms. Dickerson.

4.  The U.S. Marshal is **DIRECTED** to serve a copy of this Order on Ms. Dickerson at 33 E. Robinson Street, Suite 113, Orlando, FL 32801.

5.  The Clerk is **DIRECTED** to assign a new criminal case number to the contempt matter against Ms. Dickerson that is now pending.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 18, 2018.



ROY B. DALTON JR.
United States District Judge

-2-

Copies:
Nichole Blair Dickerson
United States Attorney's Office for the
Middle District of Florida

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                    CASE NUMBER 6:18-cr-215
 3


 4     .   .   .   .   .   .   .   .   .   .   .   .   .
       UNITED STATES OF AMERICA,       :
 5                                      :
                Plaintiff,              :       Orlando, Florida
 6                                      :       November 16, 2018
                     v.                 :       11:02 a.m.
 7                                      :
       NICOLE BLAIR DICKERSON,          :
 8                                      :
                Defendant.              :
 9     .   .   .   .   .   .   .   .   .   .   .   .   .


10
                   TRANSCRIPT OF STATUS CONFERENCE
11             BEFORE THE HONORABLE ROY B. DALTON, JR.
                   UNITED STATES DISTRICT JUDGE
12


13


14     APPEARANCES:


15


16     Counsel for Plaintiff:        Kevin C. Frein


17


18     Pro Se Defendant:            Nicole Blair Dickerson


19


20


21     Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                           Federal Official Court Reporter
22                         401 West Central Boulevard, Suite 4600
                           Orlando, Florida  32801
23                         AmieFirst.CourtReporter@gmail.com


24     Proceedings recorded by mechanical stenography.


25     Transcript produced by Computer-Aided Transcription.
```

```
 1                    P R O C E E D I N G S

 2                         * * * * *

 3            THE DEPUTY CLERK:  Case Number

 4   6:18-cr-215-ORL-37DCI, United States of America versus

 5   Nicole Blair Dickerson.

 6            Counsel, please state your appearance for the

 7   record.

 8            MR. FREIN:  Good morning, Your Honor.  Kevin Frein

 9   on behalf of the United States Attorney's Office.  I'm with

10   their Jacksonville Division.

11            THE COURT:  Good morning, Mr. Frein.

12            MR. FREIN:  Yes.

13            MS. DICKERSON:  Good morning.  Nicole Dickerson

14   appearing on behalf of myself.

15            THE COURT:  Good morning, Ms. Dickerson.

16            We're here at the Government's request for a

17   status conference.

18            Mr. Frein, I understand that you think there's

19   some impediment to proceeding with the criminal contempt

20   process.  Is that right?

21            MR. FREIN:  Yes, Your Honor.  If I may be heard.

22            THE COURT:  Come to the podium and tell me what

23   you think the problems are.

24            MR. FREIN:  Your Honor, looking at the three

25   distinct areas that were outlined in what was filed as
```

1   document number 1 -- that is your notice and order in this

2   particular case -- Your Honor, dated September the 18th

3   of 2018.

4           In looking at the first area -- that is the

5   criminal contempt proceeding regarding Ms. Dickerson's

6   violation of what is referred to as the standing order --

7   that is the order regarding the use and possession of

8   electronic devices in the courthouse.

9           In reviewing the case law in the Eleventh Circuit

10  that is applicable to a criminal contempt proceeding, in

11  substance, the investigation of the U.S. Attorney's Office

12  determined that in the third element of a criminal contempt

13  charge, that is that the violation of a lawful order of

14  reasonable specificity was willful.

15          The U.S. Attorney's Office came to the conclusion

16  based on our review of the evidence that we would be unable

17  to show that Ms. Dickerson's conduct regarding her

18  paralegal, Ms. Edwards, was willful in nature, Your Honor.

19          And depending on the Court's desire, I can go into

20  more detail of what that was.  Or if that's sufficient for

21  Your Honor, I'll move on from there.

22          THE COURT:  Well, I do have a question about that.

23  Hang on a minute.  I'm trying to get the case number up

24  here.

25          So the United States Attorney made a determination

1  it was unable to establish the issue of the element of

2  willfulness as it relates to the violation of the standing

3  order?

4          MR. FREIN:  That is correct.  Yes, Your Honor.

5          THE COURT:  And what about violation of the

6  Court's order to appear to show cause as to why she

7  shouldn't be held in contempt at the initial receiving?

8  What about that aspect?

9          MR. FREIN:  That was the same analysis,

10  Your Honor.  That is that regarding the willfulness of

11  Ms. Dickerson, the United States did not believe in our

12  assessment of the evidence that we would be able to show

13  that Ms. Dickerson acted in a willful nature in violation

14  of the Court's order, Your Honor.

15          THE COURT:  Okay.  Did the Government determine

16  whether or not Ms. Dickerson -- Ms. Dickerson signed or her

17  office signed for a certified copy of the Court's order, as

18  I understand it.

19          MR. FREIN:  That is correct, Your Honor.  The

20  evidence showed that Ms. Dickerson employs a paralegal,

21  Ms. Knalia -- if I'm saying that first name right --

22  Edwards.  And we were able to establish that

23  Ms. Dickerson -- her paralegal signed the registered

24  receipt for the mailing of the notice from the Clerk of the

25  Court designating the date and time for that hearing.

1          The notice part of it we determined was not an

2     issue.  It was the willful nature of it.  And if the Court

3     so desires, I can explain more about that analysis by the

4     U.S. Attorney's Office.

5          THE COURT:  I would like to have some more

6     analysis because I'm struggling to understand how a failure

7     to appear on an order to respond to an order of the Court

8     that was admittedly received by the defendant's staff is

9     not open and obvious contempt and a willful failure to

10    comply with the order, the lawful order of the Court.

11         MR. FREIN:  Yes, Your Honor.

12         Your Honor, and first of all, in the Eleventh

13    Circuit, the case law that speaks of the issue of

14    willfulness seemed to always cite back to a Ninth Circuit

15    case of Falstaff Brewing Corporation versus Miller Brewing

16    Corporation at 702 F.2d 770.  And that's a 1983 Ninth

17    Circuit case.

18         And they would quote the same language.  And I'll

19    now quote it for Your Honor.

20         An essential element of criminal contempt is an

21    intent either specific or general to commit it.  By

22    definition, contempt is a willful disregard or disobedience

23    of public authority.  In criminal contempt, willfulness

24    means a deliberate or intended violation as distinguished

25    from an accidental, inadvertent, or negligent violation of

```
 1   an order.
 2          In looking at Ms. Dickerson's operation of her law
 3   firm -- and I do want to preface my comments of
 4   understanding the expectation of professionalism within
 5   your courtroom and any other judge's courtroom.  So my
 6   comments are not meant as a personal attack on her or the
 7   operation of her law firm.
 8          But the investigation showed, I would suggest to
 9   the Court, a scenario where the demand for Ms. Dickerson's
10   services and her providing those services to her clients
11   far outpaced any guidance, instruction, or overall
12   organization within her law firm.
13          It appeared as though there was really no
14   discerning guidance to the two employees that Ms. Dickerson
15   had regarding how to distinguish a notice of a court that
16   came in the mail versus just other mail that came in.
17          In fact, there didn't really seem to be a system
18   in and of itself of how the operational aspects of the
19   office ran when it came to items that came into the office
20   through the mail that were related to whether State or two
21   of the federal cases that Ms. Dickerson --
22          THE COURT:  Can I interrupt you for just a second
23   and see if I can summarize the Government's position.
24          Is it the Government's position that
25   Ms. Dickerson's office is so disorganized, that her failure
```

1   to instruct her employees was so obvious that you were

2   unable to demonstrate that she had willfully -- that she

3   had received notice of the order and willfully ignored it?

4   Is that where you're going?

5           MR. FREIN:  That is, yes, Your Honor.

6           THE COURT:  Okay.  Let me talk to Ms. Dickerson

7   for a moment.

8           Ms. Dickerson, why don't you come to the podium.

9           MS. DICKERSON:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          So regardless of whether or not the United States

12  thinks that they can move forward with a prosecution for a

13  criminal contempt, you can certainly still be held in civil

14  contempt, which I intend to do.

15          But I want to give you an opportunity to tell me

16  what's going on with you and why you have disregarded the

17  Court's efforts to, first of all, get you in here to talk

18  to you about the violation of the standing order, to start

19  with.

20          Secondly, the failure to appear in response to my

21  order, and the failure at least as far as I know to this

22  point to pay the fine that was ordered by Judge Presnell.

23          So I want to give you that opportunity now.  And

24  then I'll make a determination as to whether or not I think

25  any sanctions are appropriate to be civilly imposed.

1        MS. DICKERSON:  Well, first, in regards to the

2   violation of the standing order, we had conducted two

3   trials before.  And Ms. Edwards was my paralegal at that

4   time.  She attended those trials with me.

5        And while I was trying the case, my client and I

6   would sit up here.  She would sit in the gallery.  And she

7   would actually have my cell phone, because I didn't want my

8   cell phone to be even vibrating to the point where it might

9   disrupt the trial.

10        She had -- I really did not know that that would

11   have been a violation of the rules.  And again, the first

12   two trials and a couple of bond hearings that we've

13   attended, Ms. Edwards was present, had my cell phone at

14   that time.

15        I think in the third trial, it's my understanding

16   that, I guess, a light was blinking and she was asked to

17   leave.  So I think that may have been the first time that

18   it ever came to the deputy's attention.

19        And Ms. Edwards, my understanding, had a bit of an

20   issue with the deputies when they asked her to leave.  But

21   she didn't return for the remainder of the trial and that

22   didn't continue.  As soon as that came to my attention,

23   that was corrected.

24        In regards to the failing to appear --

25        THE COURT:  Well, let me stop you there on the

1  standing order issue.

2        First of all, lack of familiarity with a standing

3  order is not a defense.  It's your obligation as an officer

4  of the court if you're going to appear in the United States

5  District Court in the Middle District of Florida, it's your

6  obligation as a professional to familiarize yourself with

7  the standing orders of the Court.

8        And it's your obligation to make sure that your

9  staff is familiar with the standing orders of the Court and

10  that you and your staff comply with those orders.  So lack

11  of familiarity with the orders is not helpful to your

12  defense.

13        MS. DICKERSON:  And, Your Honor, I would -- I

14  really wasn't asserting that as a defense, to be honest.

15        Even after becoming familiar with the standing

16  order, I can't necessarily say I wouldn't still have given

17  the phone to my employee because the standing order, the

18  only reference just says not to give it to another person.

19  While understandably my employee is a person, I did see her

20  as an extension of my office and an extension of my law

21  firm.

22        I can't say that even if I had read the language

23  of the standing order that I would have refrained from

24  giving her my cell phone so it wouldn't disturb the trial.

25  I believed her to essentially have that special

1   relationship of an employee where that wouldn't have been a

2   violation of the standing order.

3          But I understand that differing minds would come

4   -- might come to a different conclusion.

5          THE COURT:  Okay.  Well, I'm going to let you move

6   on to the failure to respond to my order to appear.

7          MS. DICKERSON:  Yes, Your Honor.

8          And the Government alluded to the fact that

9   Ms. Edwards did -- my office did receive and did sign for

10  that order.  However, that envelope was not opened by my

11  staff and was essentially just placed on my desk.

12         The first time that I became aware that anything

13  had even been mailed to me was when I was served personally

14  with a copy of the order on September the 18th by the

15  deputies that -- by the marshals that came to my office.

16  And when the marshal served me and I signed for it, he

17  asked me why I had missed court.  And I was -- I didn't

18  even know that there was an action pending against me.  I

19  thought he was referring to one of my two open cases, and I

20  knew that neither of those cases had a court date from the

21  day before.

22         And he said something about notice being mailed to

23  me.  And so I went back and I spoke with my assistant.  And

24  it was at that time that she said, oh, yeah, something did

25  come from the federal court.  And we found the envelope

1    kind of under some papers on my desk.

2            At the time, I didn't open it because I did want

3    the Court to be aware and the Government to be aware that I

4    really did not know of that court date.  And I provided

5    that.  I never opened the envelope.  I provided that

6    unopened envelope -- excuse me.  I provided that unopened

7    envelope to the Government last week for their inspection.

8            Had I known or had any idea of a court date, I

9    absolutely would have been there.

10           And then in regards to the third --

11           THE COURT:  Again, I'll just stop you there.  With

12   all respect to the Government's analysis, failure to open

13   your mail is not a defense.  When the mail is received,

14   delivered in accordance with the constraints of the United

15   States Postal Service that you receive to your office --

16   you can't have it both ways, I guess, Ms. Dickerson.

17           You can't, for instance, say that your employee is

18   an extension of your office in the context of her being

19   able to access your cell phone and then attempt to divorce

20   yourself from your staff when you are trying to avoid

21   acknowledging receipt of a Court's order to appear.

22           So the fact that you didn't open your mail -- so

23   I'm not trying to disrespect Mr. Frein's assessment that

24   that impairs their ability to show willfulness.  Whether

25   that's actually a factual question for the fact finder is

1    probably where I would have come down on it.  But I'm

2    respectful of the Government exercising its authority under

3    the executive branch with respect to the decision as to

4    whether or not to prosecute you criminally.

5         But I will tell you from my vantage point, when

6    you receive something in the United States mail by

7    certified mail, this is not something that just came in and

8    somebody could have thought, you know, it was a piece of

9    junk mail.  This is a piece of certified mail from the

10   United States District Court which was signed for by your

11   staff.  So you got it and knowledge of its contents is

12   imputed to you.

13        So it's not a defense as far as I'm concerned of

14   failure to appear.  But I understand -- I hear the words

15   you're saying.  So let me let you move on.

16        MS. DICKERSON:  Oh, and then in regards to the

17   third violation, when Judge Presnell had ordered the $100

18   fine, he initially ordered it orally.  He did not reference

19   a particular due date.  That was on the second day of our

20   trial.  I believe the trial extended another two days.

21        During that trial, I believe I received an email

22   -- like an e-service kind of receipt saying that there was

23   an order of the Court filed.  And on the summary in that,

24   contained in that email it stated that the fine was due on

25   September the 4th, which I knew had to be an error

1    because the fine actually wasn't ordered until the 5th.

2         It was an email that I received while I was in

3    trial in Mr. Rolle's case.  I kind of made a mental note to

4    myself to go and check on that earlier.  I never opened the

5    -- I never clicked on the link to open that document.

6         And, again, in my discussions with the Government,

7    I've been very forthcoming.  I admit without a doubt that I

8    failed to pay that fine.  I don't want to appear to the

9    Court as if I'm really trying to make an excuse for that.

10   I was late on paying the fine.

11        THE COURT:  Have you paid it?

12        MS. DICKERSON:  Yes, yes.

13        THE COURT:  When did you pay it?

14        MS. DICKERSON:  I believe it was October the

15   1st.

16        THE COURT:  When were you served with the Court's

17   order, the contempt order?  When did the marshal's office

18   come and serve you?

19        MS. DICKERSON:  September the -- either the

20   18th or the 19th.  I did make -- I came down to the

21   Clerk's Office with a credit card.  They told me that I

22   couldn't pay with a credit card, that I needed to pay with

23   cash or money order.  And so I came at kind of my next

24   available opportunity.

25        THE COURT:  Your next available opportunity?

1          MS. DICKERSON:  And I --

2          THE COURT:  That's your next available

3    opportunity?

4          MS. DICKERSON:  And I paid in cash.

5          THE COURT:  So let me just take this opportunity

6    to tell you, Ms. Dickerson, that it does not sound to me

7    like you're qualified to practice in the United States

8    District Court based on your current level of office

9    organization or professionalism.

10         I'm not going to make that determination by myself

11   because I'd like to get some input from our grievance

12   committee.  So I'm going to refer this matter to the

13   Court's grievance committee to let them look into it and

14   make a recommendation to me as to whether or not you should

15   be -- your Bar privileges should be either suspended or

16   revoked.

17         Because let me just recite for you some of the

18   issues which I know that you're already aware of.  But the

19   privilege -- and it is a privilege -- of practicing in this

20   bar of the United States District Court is something that

21   is not an entitlement.  Being a member of the Florida Bar

22   doesn't automatically entitle you to practice in the

23   United States District Court.  You have to demonstrate that

24   you have a level of professionalism and the ability to take

25   responsibility and the competence to practice here.

```
 1              And based on what I'm seeing in terms of the

 2    development of this situation, I'm not persuaded that you

 3    meet the standard that would be required to practice here.

 4    So I'm going to refer it to the grievance committee.

 5              But I do want to take this opportunity to tell

 6    you, until I hear back from the grievance committee that

 7    while the Government has -- as I said, I'm very respectful

 8    of the Government's decision not to proceed with criminal

 9    contempt proceedings, that I do think civil contempt is

10    appropriate.  And I'm going to give some thought to what I

11    think is an appropriate fine.

12              Because here's what I'm trying to do,

13    Ms. Dickerson.  I'm trying to find out what it would take

14    to get your attention, and I'm concerned that even now the

15    Court doesn't have your attention.

16              I find it, frankly, stupefying that a practicing

17    lawyer who wants to appear in the United States District

18    Court would be so cavalier, first of all, about receiving a

19    fine from the presiding judge at all; secondly, not

20    bothering to, as you say, click on the attachment; not

21    bothering to open your mail; not bothering to pay the fine;

22    attempting to pay the fine and being told it must be paid

23    with cash and then saying either -- to yourself, I guess,

24    that you would just get around to it when you next had an

25    opportunity.  It's stupefying and unacceptable.  I'm not
```

1    going to tolerate it.

2           And so I'm not going to permit you to practice

3    here unless I'm convinced that you're going to do something

4    to up your game.

5           So I'd like to know whether or not you have any

6    thoughts on that subject.

7           MS. DICKERSON:  I would like to do whatever the

8    Court wanted me to.

9           THE COURT:  You don't seem to be particularly

10   remorseful about your conduct.

11          I'd like to know, have you done anything from the

12   time that this began to try to rectify your staffing

13   situation, to try to train your office and try to

14   familiarize yourself with the Court's practice rules and to

15   pass that information on to your employees?

16          MS. DICKERSON:  I certainly have.

17          THE COURT:  Okay.  Well, help me with that.  I

18   can't read your mind unless you tell me what you've done to

19   try to remediate the situation.  All I have is what's in

20   front of me, which is not helpful.

21          MS. DICKERSON:  Well, we've created a system where

22   every time that mail comes in, my employees will create a

23   memo of the items that come in so I can kind of check it

24   against items that go on the calendar and things of that

25   nature.  They also leave it for my review.  I review these

1   items every day.

2        I've trained -- I only have two employees.  I have

3   one part time and one full time.  I've trained both of

4   those.

5        We've both reviewed the standing order.

6   Ms. Edwards, during the trial, was told not to come back

7   to this courthouse.  So she hasn't been back to the

8   courthouse.  However, she was still made aware of that

9   standing order.

10        We've also reviewed several other standing orders

11   that relate to the court and the rules of the Middle

12   District Court so that we can be more familiar with what's

13   expected of both myself and my office.

14        THE COURT:  Okay.  I have a copy of

15   Judge Presnell's order in front of me.  Judge Presnell's

16   order was entered on September the 6th of 2018.

17        It was docketed as doc number 110 in your case, in

18   the case where you appeared as counsel for Mr. Rolle or

19   Rolle, however you say his last name.

20        MS. DICKERSON:  Mr. Rolle.

21        THE COURT:  And the fine was due no later than

22   September the 14th, 2018, sanction fine of $100.

23        So I'm not sure I understand where the ambiguity

24   is in Judge Presnell's order.

25        MS. DICKERSON:  Your Honor, he just stated it

1    orally on the record.  And it was just me and Mr. Rolle.

2    And I was focusing my attention -- I understand that.

3         When I received that email, the service

4    notification of it, we were still in trial.  From my mobile

5    device when I click on that item, it doesn't take me

6    directly to the document because my log-in information is

7    not saved in my mobile device as far as logging into the

8    Court's Pacer system.

9         And so I made a note to check on it after the

10   trial was concluded.  It completely slipped my mind.  I'm

11   not trying to use that as an excuse.  I sincerely apologize

12   for that.

13        And that's why when I spoke with the Government I

14   agreed immediately, that I would admit that I paid the fine

15   late.

16        THE COURT:  All right.  Thank you, Ms. Dickerson.

17        So, Mr. Frein, does the Government have any

18   recommendations with respect to the current action, the

19   criminal contempt action?

20        MR. FREIN:  Your Honor, I would defer to the Court

21   as to what it deems appropriate.

22        THE COURT:  Okay.

23        Ms. Dickerson, do you have any cases in which

24   you're counsel of record presently pending in the

25   United States District Court?

```
 1              MS. DICKERSON:  Yes, Your Honor.  I have two.

 2              THE COURT:  And do you know who the presiding

 3    judges are in those two cases?

 4              MS. DICKERSON:  Judge Presnell is presiding over

 5    the sentencing of Mr. Rolle on December the 13th.  And

 6    Judge Byron presides over my other case for Catrell Ivory.

 7              THE COURT:  Okay.

 8              MS. DICKERSON:  Which I believe is set for a

 9    status in January.

10              THE COURT:  Okay.

11              Okay.  Ms. Dickerson, what I'm going to do is in

12    light of the Government's representation that they feel

13    they are unable to meet the willfulness element of the

14    criminal contempt proceedings, I'm going to dismiss the

15    action 18-cr-215.

16              I guess that's it, Mr. Countryman?

17              THE DEPUTY CLERK:  Yes, sir.

18              THE COURT:  I'm going to refer the situation to

19    the grievance committee for the Middle District, Orlando

20    Division and ask them to report back to me in some

21    reasonable period of time, 30 or 60 days, as to any

22    recommendations that they have with regard to your status

23    or an appropriate sanction for failure to comply with the

24    Court's orders.

25              And I want to -- I may see you again in this
```

1   connection once I have gotten word back from the grievance

2   committee with respect to their recommendations.

3          But I don't want to let this opportunity go by

4   without telling you again that the level of professionalism

5   and competence that you've displayed up to this point in

6   time is not an acceptable level for a practitioner here in

7   this court.  And I can't make that point any more strongly

8   than I have this morning.

9          And so I hope you'll heed it.  Because regardless

10  of what the grievance committee says, if it comes to my

11  attention again as the administrative chief for Orlando --

12  of course, my colleagues are always free to sanction you if

13  necessary, and I'm sure they won't hesitate to do that --

14          But if it comes to my attention again that any of

15  my colleagues have had problems with you in terms of your

16  competence, professionalism, respect for the Court's

17  orders, or compliance with the Court's orders, regardless

18  of what the grievance committee says, I am going to suspend

19  your privilege.  And I'll make a referral to the Florida

20  Bar with respect to your competence.

21          I'm not going to do that this morning even though

22  I think it's warranted.  Because I appreciate the

23  consequences of a referral to the Florida Bar are serious

24  and significant.  But your conduct in this case warrants a

25  response that is serious and significant.

1          So I am -- I am, whether you appreciate it or not,

2     doing you a favor by not referring this matter directly to

3     the Florida Bar for an investigation as to whether or not

4     your privilege to practice law should be restricted or

5     suspended in some way because of your conduct.

6          But I am going to ask our grievance committee to

7     make a recommendation to me with respect to your ability to

8     practice here.  So I'll be in touch with you once I hear

9     from the grievance committee.

10          And I'm sure they will be in touch with you.

11     They'll need to do an investigation somewhat similar to

12     that done by Mr. Frein.  I am going to recommend to the

13     grievance committee that they contact Mr. Frein and avail

14     themselves of the benefit of his investigation to the

15     extent that he's authorized and at liberty to disclose it

16     to them.

17          I'm certainly going to represent to the

18     United States, to the prosecutor, that the Court has no

19     concerns about the U.S. Attorney's Office sharing the

20     results of its investigation with the grievance committee.

21          So we'll see what they say.  And then I'll make up

22     my own mind as to whether or not I think what they've

23     recommended is a significant enough sanction.

24          But you do need to be sanctioned.  And so you can

25     anticipate that you're going to be sanctioned.  But I'm

```
1    going to get the input from somebody who can maybe look at

2    it perhaps more in context from the standpoint of a

3    practitioner and make a recommendation to me.

4           But as I said, regardless of what they say, what

5    I've seen to this point will not be allowed to continue.

6           Fair enough?

7           MS. DICKERSON:  Yes, sir.

8           THE COURT:  Okay.  All right.  Anything else from

9    the United States, Mr. Frein?

10          MR. FREIN:  Your Honor, no.

11          Just procedurally, to ensure I am where I need to

12   be, I interpret the Court's statement regarding the

13   dismissal of this action means the trial set for next

14   Tuesday is canceled.

15          THE COURT:  Yes.  The trial is canceled and the

16   Government is discharged from any further obligations with

17   respect to the Court's request that they make an appearance

18   as a prosecuting authority in connection with the Court's

19   contempt referral.

20          So I appreciate very much your service, Mr. Frein.

21   And please communicate that to your superiors as well, that

22   the Court is always grateful for the United States

23   Attorney's willingness to step up and fill its executive

24   role as the prosecuting authority.

25          And I want to again make the point that I am --
```

```
 1    while I may not always agree with the Government's

 2    decisions with respect to their charging decisions or

 3    decisions with respect to prosecution, that I'm very

 4    respectful of the division of labor and division of

 5    responsibility between the executive and the judicial

 6    branch.  And I respect your decision.  And I respect your

 7    opinion with regard to the propriety of proceeding with the

 8    prosecution.

 9            And thank you for your good work.

10            MR. FREIN:  Thank you, Your Honor.

11            THE COURT:  We'll be in recess.

12            (Proceedings adjourned at 11:32 a.m.)

13                        * * * * *

14

15                    C E R T I F I C A T E

16

17            I certify that the foregoing is a correct

18    transcript from the record of proceedings in the

19    above-entitled matter.

20

21    November 29, 2018

22

23        s\  Amie R. First
      Amie R. First, RDR, CRR, CRC, CPE
24    Federal Official Court Reporter
      United States District Court
25    Middle District of Florida
```

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re NICOLE B. DICKERSON,

                                             Case No. 6:18-cr-215-Orl-37DCI

        Respondent.

_____/

### REPORT AND RECOMMENDATION OF THE GRIEVANCE COMMITTEE

Pursuant to U.S. District Judge Roy B. Dalton, Jr.'s Order dated November 16, 2018 (the "Referral Order"), on the matter of attorney Nicole B. Dickerson's ("Respondent") conduct, the Grievance Committee of the U.S. District Court for the Middle District of Florida, Orlando Division (the "Committee") reports and recommends as follows:

### BACKGROUND

**I.**      **Respondent**

Respondent passed the bar in September 2015. She has appeared as counsel in five cases in the Middle District of Florida: Case Nos. 6:09-cr-103, 6:16-cr-256, 6:17-cr-301, 6:17-cv-37, and 6:18-cr-166. All but the last case are currently closed.

**II.**      **The *Rolle* Case**

The conduct at issue first arose during trial before U.S. District Judge Gregory A. Presnell in the case of *United States v. Rolle*, Case No. 6:17-cr-301-Orl-31GJK ("*Rolle*"), in which Respondent appeared as lead counsel for the defendant.

On February 13, 2018, Respondent failed to appear to represent her client at a status conference before Judge Presnell. (*Rolle*, Doc. 16.)

On May 30, 2018, Respondent appeared twelve minutes late to the second day of trial. (*Id.*, Doc. 43.)

1

On August 14, 2018, Respondent failed to appear at another status conference. She called in twenty-one minutes later. (*Id.*, Doc. 91.)

On September 4, 2018, a court security officer ("CSO") noticed Respondent's paralegal, Ms. Edwards, using Respondent's cell phone during trial, in violation of the Court's Standing Order on the Possession and Use of Personal Electronic Devices in Federal Courthouses in the Middle District of Florida. (*See* 6:13-mc-94-Orl-22 ("Standing Order".) According to the CSO, Ms. Edwards was texting, and the light from the phone was disturbing the proceedings. (*See* Court Facility Incident Report dated Sept. 5, 2018) ("Report").) After the CSO confronted Ms. Edwards about using the cell phone in the courtroom during court proceedings, a dispute occurred between Ms. Edwards and the CSO, which, according to the Report, resulted in Ms. Edwards cursing at the CSO and then being escorted out of the courthouse. (*See id.*) Judge Presnell stated that Ms. Edwards is barred from the courthouse. (*Rolle*, Tr. dated Sept. 5, 2018.) Respondent asserted to the Committee that she suspended Ms. Edwards as a result of her conduct.

The following day, September 5, 2018, Respondent again arrived late to trial, this time resulting in the imposition of a $100.00 fine by Judge Presnell. Judge Presnell implicitly referred back to Respondent's prior failures and remarked that the fine was because he was "tired of [her] excuses." (*Rolle*, Tr. dated Sept. 5, 2018.) The Committee notes that Judge Presnell had previously made accommodations for Respondent to begin trial later in the day because Respondent had to drop off her daughters at school; however, despite this accommodation, Respondent was still late.

2

An order dated September 6, 2018, provided that the fine was due to be paid by September 14, 2018. (*Id.*, Doc. 110.)

### III.    The Late Fine

Respondent failed to pay the fine imposed by Judge Presnell by the September 14, 2018 due date. In a letter to the Committee dated January 10, 2019 ("Letter"), Respondent asserted that she did not become aware of the fine's due date until September 19, 2018, when she was served with an Order to Show Cause by the U.S. Marshal containing the sanctions order. The Committee finds this assertion to be either not credible or inexcusable. Because Respondent was lead counsel on the *Rolle* case, she necessarily would have received electronic notice of the order filed on September 6, which set out the September 14 due date for the fine. She asserted in her Letter to the Committee that she did not click on the link to open that document during trial. The Committee finds that there was no excuse for Respondent not to timely pay the fine, of which she was notified on September 6.

Respondent asserts in her Letter that, after learning of the fine on September 19, she was unable to pay the fine on September 19 or 20. Then on September 21, Respondent was remanded to County Jail, where she served an eight-day sentence. This sentence stemmed from an October 2017 arrest, trial, and conviction on a charge of resisting an officer without violence. In March 2018, the court suspended her sentence on the condition that she complete 100 hours of community service by October 2018 and write a letter of apology to the officers. By July 2018, Respondent asserts that "it became evident that [she] could not complete the hours," and she was set to be remanded to jail on September 21, 2018. (It is unclear whether Respondent wrote the required letter of apology and why she could not complete the court-

3

ordered community service.) Respondent was released from jail on September 28. She asserted in her Letter that she paid the fine the next business day, on October 1. The Committee notes that no record of the Court receiving the payment is listed on the docket. Notably, during her status conference before Judge Dalton (discussed *infra*), Respondent did not advise the Court of this circumstance.

### IV.    The Contempt Case

As a result of Respondent's violation of the Court's Standing Order, Judge Dalton issued Respondent an Order to Show Cause why she should not be sanctioned. That Order set a hearing for September 18, 2018. Notice of the hearing was sent to Respondent by certified mail. (*See* No. 6:18-cr-215 ("*Dickerson*"), Doc. 1.) The Committee reviewed the mail tracking, which shows that Respondent's paralegal, Ms. Edwards, who was apparently suspended for the court incident the previous week, signed for the package on September 13, 2018. Respondent failed to appear at the hearing.

Respondent's Letter to the Committee asserted that she had failed to "properly train[] Ms. Edwards about mail procedures," and that the incident taught her "how important mail procedures are to a business." Given that this incident occurred in September 2018 and Respondent has owned and operated her own law firm since December 2015, the Committee finds this assertion troubling.

As a result of her failure to appear, failure to timely pay the fine, and violation of the Court's Standing Order, Judge Dalton opened the instant contempt matter and ordered Respondent to appear for a criminal contempt trial on October 3, 2018. After granting a continuance, the case was set for a status conference on November 16, 2018. (Doc. 11.) At that

4

conference, the U.S. Attorney's Office advised Judge Dalton that they did not believe they could proceed with the criminal contempt case because they did not believe that Respondent's actions were willful. Judge Dalton advised that, in the absence of a criminal contempt action, he intended to impose civil contempt sanctions. He stated:

> I find it, frankly, stupefying that a practicing lawyer who wants to appear in the United States District Court would be so cavalier, first of all, about receiving a fine from the presiding judge at all; secondly, not bothering to, as you say, click on the attachment; not bothering to open your mail; not bothering to pay the fine; attempting to pay the fine and being told it must be paid with cash and then saying . . . I guess, that you would just get around to it when you next had an opportunity.

(Tr. dated Nov. 16, 2018.) Judge Dalton accordingly dismissed the criminal contempt case and referred the instant matter to the Committee.

The question before the Committee are what sanctions, if any, should be imposed against Respondent, including whether Respondent should be suspended or removed from the Bar of the Middle District of Florida and whether monetary fines should be imposed.

## V.    Other Issues

The Committee also notes that in *United States v. Ivory*, Case No. 6:18-cr-166 ("*Ivory*"), subsequent to the referral of this matter to the Committee, Magistrate Judge Spaulding denied Respondent's motion for a writ of habeas corpus seeking to transport "a necessary witness for the Defense" to Florida to testify. (*Id.*, Doc. 47.) Judge Spaulding denied that motion because "Counsel for Defendant unduly delayed in requesting the writ," which would have delayed trial. (*Id.*, Doc. 51.) Multiple requests from Respondent for trial continuances were later denied. (*Id.*, Docs. 61, 66.) District Judge Byron, in denying a continuance, chastised Respondent's untimeliness and noted that "the Court does not agree

that delaying in the preparation of one's case in the event it may settle short of trial justifies a continuance." (*Id.*, Doc. 61, p. 3.) Judge Byron further noted that "defense counsel fails to justify the lengthy delay i[n] seeking the issuance of a writ to compel [the witness's] appearance at trial." (*Id.* at 2–3.)

The Committee also notes that in *Florida v. Teague*, Case No. 18-904, subsequent to the referral of this matter to the Committee, the Florida Fifth District Court of Appeal sanctioned Respondent in an Order dated December 10, 2018. That sanction was based on Respondent's failure to timely open orders in cases in which she was listed as counsel of record, her failure to be familiar with relevant rules, and her dilatory conduct which led to her clients' appeals being dismissed. She was also late to her sanctions hearing before that court. In other words: Respondent was sanctioned by the Fifth DCA for the same pattern of behavior she has exhibited in this Court.

With this background, the Committee now considers its recommendations.

## STANDARDS

Rule 4-1.3 of the Florida Rules of Professional Conduct requires that: "A lawyer shall act with reasonable diligence and promptness in representing a client." The comments to that Rule provide: "A lawyer's workload must be controlled so that each matter can be handled competently."

Rule 4-3.2 requires that: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The comments provide: "Dilatory practices bring the administration of justice into disrepute."

6

The Court's Standing Order provides as follows: "Any attorney . . . may bring any personal electronic device beyond the courthouse's security checkpoint by presenting a valid Florida Bar identification card . . . ." (*Id.* ¶ 2.4.) However, the attorney "may not share [the device] with *anyone*," and "may not use it in a manner that disrupts any judicial proceeding." (*Id.* ¶ 2 (emphasis added).)

## RECOMMENDATION

The Committee's investigation included a review of the Referral Order; a review of the dockets of the *Rolle* case and the instant case, and transcripts from the same; the January 10, 2019 Letter from Respondent to the Committee with attachments; a letter from Assistant U.S. Attorney Kevin C. Frein to the Committee with attachments; the September 5, 2018 Report; and dockets of other cases involving Respondent.

Based on the Committee's investigation, the Committee concludes that serious sanctions are in order. As stated by Judge Dalton during the November 16, 2018 Status Conference, the ability to practice law in the Middle District of Florida is a privilege, not a right. A practitioner in this Court must show that she has an acceptable level of professionalism and competence to practice in Federal Court. The Committee's review of the record leads it to conclude that Respondent has not exhibited those attributes.

The facts that led Assistant U.S. Attorney Frein to advise the Court that the Government would not pursue criminal prosecution of Respondent for contempt are the same facts that support the Committee's recommendation for sanctions. As he put it, "the demand for Ms. Dickerson's services and her providing those services to her clients far outpaced any guidance, instruction, or overall organization within her law firm. It appeared as though there

7

was really no discerning guidance to the two employees that Ms. Dickerson had . . . ." Further, Respondent's Letter to the Committee essentially admitted the lack of training, organization, and professionalism in her office that led to this referral. She also admitted that she had not familiarized herself with the Court's rules, nor had she made certain that her staff was aware of those rules.

While these facts may have absolved Respondent of criminal responsibility for her actions at issue in the *Dickerson* case, they do not justify them. Respondent has exhibited a pattern of failing to appear, or appearing late, for court hearings, and of other dilatory conduct impacting her clients. This pattern is unacceptable regardless of whether those failures are the result of Respondent's intentional misconduct, negligence, or failure to properly hire and train firm employees.

Respondent's Letter advised the Committee of Respondent's background, including a difficult upbringing and the fact that she is a single parent of a child with special needs. The Committee has considered Respondent's Letter and taken it into account in making the recommendations set forth herein. The Committee commends Respondent for the dedication she exhibited in achieving her goal of becoming a lawyer and practicing law.

However, the Committee was concerned by other assertions in the Letter. Respondent states that she did not "intend to cause issues during court" when permitting her paralegal to use her cell phone, yet states, glibly, "Honestly, I would have appreciated even the slightest warning or admonition when the phone was causing a distraction." Respondent states that she disciplined her paralegal for cursing at the CSO, but that paralegal was back in her office a week later, and signed the certified mail receipt accepting the Court's Order to Show Cause,

8

which was apparently never opened by Respondent or her staff, resulting in Respondent failing to appear at the hearing. Respondent states that she has taken Judge Dalton's and Judge Presnell's admonitions to heart, yet within the next few months, she delayed on filing an important motion in another case, causing Judge Byron to chastise her, and was late to another hearing—her own sanctions hearing before the Fifth DCA. She states that she learns from her past mistakes so she will not commit them again; yet, after Judge Presnell chastised her on several occasions for being late and missing court entirely—even after he made accommodations for her—she was late yet again. She states that she believes the Court made an unfair "characterization" when Judge Dalton told her she did "not bother" to complete certain tasks, and that the Court's conclusion was "wrong" when it determined that she did not take the sanction seriously. Yet, it is indisputable that she did not click on an Order *sanctioning her* and did not open certified mail from the District Court. It is indisputable that she did not advise Judge Dalton of her County Court incarceration during the time before she paid the fine, which is troubling.

The Committee does not believe that Respondent has truly reckoned with how her behavior has formed a pattern of unprofessionalism that has not only delayed the Court system and the administration of justice, but has also impacted her clients, as well.

In sum, Respondent has violated the Florida Rules of Professional Conduct as well as multiple Orders of this Court. The Committee concludes that Respondent has not demonstrated the competence and professionalism necessary to practice in the Middle District of Florida.

**CONCLUSION**

Accordingly, the Committee RECOMMENDS that the Court enter an Order as follows:

1.      Referring Respondent to the Florida Bar;

2.      Suspending Respondent from the Bar of the Middle District of Florida for a period of twelve (12) months, effective as of thirty (30) days from the date of the Order, which period is intended to permit Respondent to deal with her existing caseload and protect the interests of her existing clients during her suspension and lasting until the reinstatement conditions are met;

3.      Prohibiting Respondent from taking on new cases in the Middle District of Florida, effective as of the date of the Order and lasting until she is reinstated to the Bar of the Middle District of Florida;

4.      Setting the following reinstatement conditions, which must be met before Respondent is permitted to petition the Bar of the Middle District of Florida for reinstatement:

      a.      Submit to the Florida Bar for a "Comprehensive Evaluation";

      b.      Submit to the Florida Bar's Professionalism Workshop and Stress Management Workshop during the period of the suspension;

      c.      Attend in person and complete all aspects of a Law Practice Management CLE;

      d.      Attend in person and complete all aspects of the Practicing with Professionalism CLE;

10

e.   Pay all outstanding monetary sanctions, fees, and costs levied against her, in any federal, state, or disciplinary actions, including those sanctions that may be ordered by this Court;

f.   Complete all remediation ordered by the Florida Bar;

g.   Complete all remediation ordered by any court, including reporting of any sanctions orders levied by any court to the appropriate parties;

h.   Re-read the Florida Rules of Professional Conduct, the Local Rules of this Court, and the Court's Standing Order on the Possession and Use of Personal Electronic Devices in Federal Courthouses in the Middle District of Florida in full and certify in writing to this Court that she has done so; and

i.   Reporting to the Court the completion of subparagraphs (a) through (i) of this paragraph on or before the date marking the end of the suspension period.

This report and recommendation will be filed in the docket of the above-captioned case and copies will be provided to Chief Judge Merryday, Judge Dalton, Judge Presnell, Judge Byron, Magistrate Judge Smith, Magistrate Judge Spaulding, and Magistrate Judge Irick.

The Committee requests that the Clerk serve a copy on the Florida Bar should the Chief Judge or Judge Dalton so order.

11

Respectfully submitted,

/s/ Lauren Millcarek
Lauren Millcarek
Florida Bar No. 100317
lauren.millcarek@hklaw.com
Chair
Grievance Committee
U.S. District Court
Middle District of Florida
Orlando Division

Dated: February 15, 2019.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

v.                                                        Case No. 6:18-cr-215-Orl-37DCI

NICOLE BLAIR DICKERSON

_____

## ORDER

This case involves an array of unprofessional conduct by Defendant Nicole Blair Dickerson, an attorney appearing in multiple cases before this Court. Following Ms. Dickerson's violation of *In re: Possession and Use of Personal Electronic Devices in Federal Courthouses in the Middle District of Florida*, General Order 6:13-mc-94-22 (M.D. Fla. Sept. 26, 2013) ("**Standing Order**"), the Undersigned set a hearing for September 18, 2018, so Ms. Dickerson could show cause why sanctions should not be imposed for this violation. (Doc. 1; *see also* Doc. 13 (incident report).) When Ms. Dickerson failed to appear, the Court initiated criminal contempt proceedings against her pursuant to 18 U.S.C. § 401 for: (1) violating the Standing Order; (2) failing to appear at the show cause hearing; and (3) failing to timely pay a monetary fine imposed by U.S. District Judge Gregory A. Presnell. (Doc. 1, p. 1.)  The Court set the matter for bench trial commencing October 3, 2018. (*Id.* at 2.)

Following a trial continuance (Doc. 8), the Court held a status conference on November 16, 2018 to ascertain the U.S. Attorney's position on prosecuting criminal contempt proceedings against Ms. Dickerson. (Doc. 11 ("**Status Conference**").) At the

Status Conference counsel for the U.S Attorney's Office informed the Court that based on its investigation, it would be unable to meet the willfulness element of criminal contempt proceedings. (Doc. 14, pp. 3–7.) Thus, the Court dismissed the criminal contempt proceedings against Ms. Dickerson. (*Id.* at 19.) But the Court informed Ms. Dickerson that the situation would be referred to the Grievance Committee for the Orlando Division of the Middle District of Florida ("**Grievance Committee**") for recommendations regarding Ms. Dickerson's eligibility to practice in the Middle District of Florida and any other appropriate sanctions for failure to comply with Court orders. (*Id.* at 19–22.) Now before the Court is the Report and Recommendations of the Grievance Committee dated February 15, 2019. (Doc. 16 ("**R&R**").)

The Grievance Committee's investigation revealed the following: In *United States v. Rolle*, Case No. 6:17-cr-301-Orl-31GJK, Ms. Dickerson: (1) failed to appear at status conferences; (2) arrived late to trial multiple times; (3) violated the Court's Standing Order; and (4) failed to timely pay a monetary fine for arriving late to trial. (*Id.* at 1–4.) Prior to *United States v. Dickerson*, Case No. 6:18-cr-215-Orl-37DCI, Ms. Dickerson failed to appear at the show cause hearing that led to initiation of these contempt proceedings. (*Id.* at 4–5.) In *United States v. Ivory*, Case No. 6:18-cr-166-Orl-40LRH, Ms. Dickerson: (1) delayed in requesting a writ of habeas corpus; (2) untimely filed motions for continuances; and (3) delayed in trial preparation. (*Id.* at 5–6.) And in a Florida Fifth District Court of Appeal case, *Florida v. Teague*, Case No. 18-904, Ms. Dickerson was sanctioned for: (1) failing to timely open orders; (2) failing to be familiar with relevant rules; and (3) dilatory conduct that led to her clients' appeals being dismissed. (*Id.* at 6.)

-2-

She also appeared late for her sanctions hearing in that case. (*Id.*) In other words, she was sanctioned for the same behavior she exhibited in this Court. (*Id.*)

Based on its investigation, the Grievance Committee found that her conduct warrants serious sanctions. (*Id.* at 7.) Specifically, the Grievance Committee reasoned that:

> While these facts may have absolved [Ms. Dickerson] of criminal responsibility for her actions at issue in the [contempt] case, they do not justify them. [Ms. Dickerson] has exhibited a pattern of failing to appear, or appearing late, for court hearings, and for other dilatory conduct impacting her clients. This pattern is unacceptable regardless of whether those failures are the result of [Ms. Dickerson's] intentional misconduct, negligence, or failure to properly hire and train firm employees.

(*Id.* at 8.) The Grievance Committee was unconvinced that Ms. Dickerson "has truly reckoned with how her behavior has formed a pattern of unprofessionalism that has not only delayed the Court system and the administration of justice, but has also impacted her clients, as well." (*Id.* at 9.) Ultimately, the Grievance Committee concluded that Ms. Dickerson "has violated the Florida Rules of Professional Conduct as well as multiple Orders of this Court" and that she "has not demonstrated the competence and professionalism necessary to practice in the Middle District of Florida." (*Id.*) So the Grievance Committee recommends the Court impose a number of severe sanctions. (*Id.* at 10–11.)

Following receipt of the R&R, the Court directed Ms. Dickerson to file a response to the R&R on or before March 6, 2019. (Doc. 17.) Ms. Dickerson failed to respond. Upon consideration of the findings and recommendations detailed in the R&R, as well as the Undersigned's own experiences with Ms. Dickerson, the Court agrees with the Grievance Committee and finds that the R&R is due to be adopted in its entirety.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  The Report and Recommendations of the Grievance Committee (Doc. 16) is

    **ADOPTED.**

2.  Nicole Blair Dickerson is **REFERRED** to the Florida Bar.

3.  Beginning Monday, **April 8, 2019,** and continuing through

    Wednesday, **April 8, 2020,** attorney Nicole Blair Dickerson is

    **SUSPENDED** from membership in the Bar of the U.S. District Court for the

    Middle District of Florida.

4.  **Effective immediately,** Ms. Dickerson is **PROHIBITED** from appearing as

    counsel in any new cases in this District and may not do so until she is

    reinstated to the Bar of the Middle District of Florida.

5.  Prior to petitioning the Bar of the Middle District of Florida for

    reinstatement, Ms. Dickerson **MUST** meet the following conditions:

    a.  Submit to the Florida Bar for a "Comprehensive Evaluation";

    b.  Submit to the Florida Bar's Professionalism Workshop and Stress

        Management Workshop during the period of the suspension;

    c.  Attend in person and complete all aspects of a Law Practice

        Management CLE;

    d.  Attend in person and complete all aspects of the Practicing with

        Professionalism CLE;

    e.  Pay all outstanding monetary sanctions, fees, and costs levied

        against her, in any federal, state, or disciplinary actions, including

-4-

those sanctions that may be ordered by this Court;

f.      Complete all remediation ordered by the Florida Bar;

g.      Complete all remediation ordered by any court, including reporting
        of any sanctions orders levied by any court to the appropriate
        parties;

h.      Re-read the Florida Rules of Professional Conduct, the Local Rules
        of this Court, and the Court's Standing Order on the Possession and
        Use of Personal Electronic Devices in Federal Courthouses in the
        Middle District of Florida in full and certify in writing to this Court
        that she has done so; and

i.      Report to the Court the completion of subparagraphs (a) through (i)
        of this paragraph on or before the date marking the end of the
        suspension period.

6.      The Clerk is **DIRECTED** to:

a.      Send a copy of this Order and the Grievance Committee's Report and
        Recommendations (Doc. 16) to the Florida Bar.

b.      Distribute a copy of this Order to all judicial officers in the Middle
        District of Florida.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 8, 2019.

-5-

ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record

Lauren Millcarek, Chair of the Grievance Committee for the Orlando Division of the
Middle District of Florida

The Florida Bar

All District and Magistrate Judges in each division of the U.S. District Court for the
Middle District of Florida

# Addendum D

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

STATE OF FLORIDA,

      Appellant,

v.                             CASE NO.  5D18-0904

JORONJAYE LEPRINO TEAGUE,

      Appellee.

_____/

DATE:  December 10, 2018

**BY ORDER OF THE COURT:**

      We ordered Appellee's counsel, Nicole B. Dickerson, to appear before this Court on November 20, 2018, at 11:00 a.m. to show cause why she should not be sanctioned. Based upon that proceeding and this Court's records, this Court makes the following findings and conclusions:

      1.      Attorney Dickerson was counsel of record for Appellee below. On March 16, 2018, Appellant filed a notice of appeal and served a copy on Attorney Dickerson. Appellant also served Attorney Dickerson with copies of six other documents that were filed in the lower court pertaining to this appeal, and the trial court furnished Attorney Dickerson with a copy of the Order for Transcription of Proceedings. On June 4, 2018, Appellant filed an initial brief in this Court and served a copy on Attorney Dickerson on the same day. After the time for filing an answer brief expired, this Court, on September 12, 2018, ordered Attorney Dickerson to advise the court within 10 days whether she continued to represent Appellee and whether she intended to file an extension of time to serve an answer brief. Having received no response, on October 9, 2018, this Court ordered Attorney Dickerson to show cause within 10 days why she should not be sanctioned for failing to respond. Once again, Attorney Dickerson failed to respond.

Accordingly, on October 23, 2018, this Court entered an order directing Attorney Dickerson to appear before this Court in person and show cause why she should not be sanctioned for failing to respond to our prior orders. That order was amended on October 24, 2018, to set a different date and time for the appearance. Both orders were sent to Attorney Dickerson electronically through eDCA; the October 24 Order was sent by certified mail as well.

2.    Attorney Dickerson appeared before this Court on November 20, 2018, albeit late, explaining that her tardiness was due to rainy weather. Her explanation for her failure to respond to this Court's orders was that the orders had gone into her "spam" folder. While acknowledging that she had not complied with her obligations in this appeal, she blamed that failure on a lack of understanding of the Florida Rules of Appellate Procedure and also claimed that an Assistant Public Defender represented to her that the Public Defender's office was handling the appeal.

3.    This Court finds that Attorney Dickerson's explanation was not credible or sufficient for the following reasons. First, this Court's records indicate that our October 9, 2018 order was opened less than one minute after it was sent. Second, Attorney Dickerson's description of her telephone conversation with the Assistant Public Defender is inherently implausible because it inexplicably contradicts the lack of any action by the Assistant Public Defender and Attorney Dickerson's failure to file a motion to substitute counsel. Third, records in other cases in this Court reflect the same pattern of behavior by Attorney Dickerson.

a.    In case number 5D16-790, Attorney Dickerson filed a notice of appeal, but failed to otherwise perfect that appeal or respond to a court order to show cause, resulting in the dismissal of that appeal.

2

b.    In case number 5D17-2330, Attorney Dickerson filed a notice of appeal. Thereafter, she filed a motion to extend the time for filing an initial brief, which was granted. Three months after the brief was due, this Court ordered Appellant to show cause why the appeal should not be dismissed. The order was transmitted to Attorney Dickerson, whose failure to respond resulted in the dismissal of that appeal.

c.    In case numbers 5D17-3611 and 5D17-3743, a consolidated appeal, Attorney Dickerson sought an extension of time to file an answer brief, which was granted, but she then failed to file the brief. That case was ultimately resolved adverse to Attorney Dickerson's client without the benefit of an answer brief.

4.    Of grave concern to this Court was Attorney Dickerson's admission during the show cause hearing that she had failed to inform her clients in those prior cases that she had neglected their appeals, instead leaving her clients with the impression that their appeals had been decided adverse to them on the merits.

5.    Also of grave concern to this Court was Attorney Dickerson's lack of candor when questioned about prior court sanctions, particularly with regard to a fine imposed by Judge Presnell in U.S. District Court for the Middle District of Florida.

6.    Attorney Dickerson's late arrival to the show cause hearing and her cavalier demeanor during the hearing and during her prior telephone conversation with our Clerk manifested a lack of understanding of the seriousness of her omissions and a deliberate disregard of the responsibilities of her profession.

7.    As of the date of the hearing, Attorney Dickerson had still neglected the instant appeal by not filing a brief or seeking to withdraw as counsel.

Based upon these findings, this Court concludes as follows:

3

A.    That Attorney Dickerson did not show just cause to avoid sanctions.

B.    Attorney Dickerson should be sanctioned for her willful disregard of this Court's orders, her failure to competently represent her clients, and her lack of candor to this Court.

C.    This Court imposes a fine of $200, payable within 10 days of the date of this order to the Clerk of this Court.

D.    Attorney Dickerson shall provide a copy of this order to each client in each case identified in this order, including her client in this appeal, and provide certified mail receipts evidencing delivery within 10 days of the date of this order.

E.    The Clerk of this Court shall furnish a copy of this order to The Florida Bar, the Clerk of the U.S. District Court for the Middle District of Florida, Orlando Division, and the Chief Judge of the Ninth Judicial Circuit Court of Florida.

*I hereby certify that the foregoing is*
*(a true copy of) the original Court order.*

*Joanne P. Simmons*
JOANNE P. SIMMONS, CLERK

Panel: Judges Torpy, Lambert, and Eisnaugle
cc:

| Office of Attorney General<br>Hon. Frederick J. Lauten | Kaylee D. Tatman<br>The Florida Bar | Nicole B. Dickerson<br>Elizabeth Warren, Clerk of<br>Court, of the U.S. Middle<br>District of Florida |
|---|---|---|

4